# Illinois Official Reports

## Appellate Court

***Taylor v. Board of Education of the City of Chicago*,
2014 IL App (1st) 123744**

| | |
|---|---|
| Appellate Court Caption | KENNETH TAYLOR, Plaintiff-Appellee, v. THE BOARD OF EDUCATION OF THE CITY OF CHICAGO, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket Nos. 1-12-3744, 1-13-0605 cons. |
| Filed<br>Rehearing denied | May 6, 2014<br>June 5, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action for retaliatory discharge and a violation of the Whistleblower Act filed against defendant school board by an assistant principal based on allegations that his contract was not renewed after he reported that a special education teacher allegedly abused a student, the judgment for plaintiff on the retaliatory discharge claim was reversed, since retaliatory discharge actions apply only to at-will employees and plaintiff worked under a contractual term of employment that was not renewed, and although plaintiff proved his claim under the Act, the reversal of the judgment on the retaliatory discharge claim required that the cause be remanded for a new trial on the damages awarded under the Act. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-L-239; the Hon. Sanjay Tailor and the Hon. Elizabeth M. Budzinski, Judges, presiding. |
| Judgment | No. 1-12-3744, Affirmed in part, reversed in part, vacated in part, and remanded.<br>No. 1-13-0605, Appeal dismissed. |

Counsel on
Appeal

James L. Bebley and Lee Ann Lowder, both of the Board of Education of the City of Chicago, for appellant.

Kent D. Sinson, of Sinson & Sinson, Ltd., David Hemenway, of David Hemenway, P.C., and Rima Kapitan, of Kapitan Law Office, all of Chicago, for appellee.

Panel

JUSTICE HOFFMAN delivered the judgment of the court, with opinion.
Presiding Justice Connors and Justice Cunningham concurred in the judgment and opinion.

## OPINION

¶ 1    The plaintiff, Kenneth Taylor, filed suit against the defendant, the Board of Education of the City of Chicago (Board), seeking damages for retaliatory discharge and violation of the Illinois Whistleblower Act (Act) (740 ILCS 174/1 *et seq.* (West 2010)), claiming that he was discharged from his employment and subjected to an ongoing campaign of retaliatory acts by the Board because he reported an act of alleged abuse perpetrated on a student by a special education teacher. A jury awarded the plaintiff $1,000,500 in damages, which includes compensatory damages arising from the discharge, and damages for emotional distress resulting from the discharge and from the Board's retaliatory conduct in the period leading to the discharge, from January 1, 2008, through June 30, 2009. The court certified this matter for appeal under Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010), but retained jurisdiction to consider a motion by the plaintiff for attorney fees, costs, and prejudgment interest under the Act. While the plaintiff's motion was pending, the Board filed a notice of appeal from the underlying judgment. The trial court subsequently granted the plaintiff's motion for fees, costs, and interest, the Board appealed, and the matters were consolidated.

¶ 2    On appeal, the Board argues that: (1) the circuit court erred in denying its motions for summary judgment, directed verdict, and judgment *n.o.v.* on the plaintiff's claim for retaliatory discharge; (2) the court's erroneous denial of its motion *in limine* seeking to exclude evidence of retaliatory acts occurring outside of the statute of limitations tainted the jury's verdict; and (3) a new trial is required because the verdict form submitted to the jury allowed one recovery for two distinct claims that arose from separate occurrences. For the reasons that follow, we reverse the judgment of the circuit court on the plaintiff's claim for retaliatory discharge, affirm the finding of the Board's liability for the claim under the Act, vacate the damage award, and remand this case for a new trial exclusively on the question of damages under the Act.

¶ 3    The plaintiff initiated this action on January 9, 2010, and filed an amended complaint on January 24, 2010. In his amended complaint, the plaintiff pled one count for retaliatory discharge and one count under the Act, seeking damages resulting from his alleged discharge, as well as from a pattern of ongoing retaliatory conduct by the Board and its employees in the months following his May 16, 2007, report to the Illinois Department of Children and Family Services (DCFS) of child abuse, and continuing until his employment ended on June 30, 2009. The alleged retaliatory conduct included a campaign of petty harassment, false charges of misconduct, repeated false allegations that the plaintiff was absent from work without leave (AWOL), and his effective demotion. The Board moved for summary judgment, arguing, in relevant part, that the plaintiff was not an at-will employee and, therefore, could not maintain an action for retaliatory discharge. Instead, the Board maintained that he was subject to a four-year term of employment which was simply not renewed as permitted under Board policy. The Board further argued that the Act did not apply to government entities at the time that the plaintiff reported the abuse at issue. On May 29, 2012, the court denied the motion, and the case proceeded to trial before a jury on both counts of the plaintiff's amended complaint.

¶ 4    Prior to trial, the Board filed a motion *in limine* seeking to bar any evidence or argument as to its alleged retaliatory acts occurring prior to January 9, 2009, one year before the plaintiff filed his claim under the Act. See 745 ILCS 10/8-101(a) (West 2008). With regard to the evidence of retaliatory conduct from May through December of 2007, the Board additionally sought exclusion on the basis that the Act did not create a right of action against public employers until January 1, 2008. See Pub. Act 95-128 (eff. Jan. 1, 2008) (amending 740 ILCS 174/5 (West 2006)). The court denied the motion, but instructed the jury that the plaintiff could not recover damages under the Act for any claimed retaliatory acts occurring prior to January 1, 2008.

¶ 5    The evidence at trial may be summarized as follows. The plaintiff commenced his employment with the Board in the fall of 1990, as a teacher at Robeson High School. By 1992, he had attained "contractual continued service," or tenure. At some point thereafter, the plaintiff became interested in educational administration and obtained a master's degree in school leadership, along with the requisite certification to serve as a principal or assistant principal. The plaintiff testified that, during his time as a teacher, he was consistently evaluated as "excellent" or better, and received the highest possible rating of "superior" during his final month of teaching in June of 2001.

¶ 6    In August 2001, the Board hired the plaintiff to serve as the assistant principal at Goodlow Magnet School (Goodlow), an elementary school for students from pre-kindergarten through eighth grade. Upon accepting the assistant principal position, the plaintiff relinquished his tenured status. The plaintiff was selected for the assistant principal position by Goodlow's principal, Patricia Lewis, who had been hired by the Board the previous month. Lewis was hired as principal at Goodlow under an employment contract with the Board that was governed by the Board's rules related to personnel policies (Board rules). The Board rules state that principals are to serve for a term of four years' duration, after which his or her contract could be terminated "for cause." The Board rules authorized the principal, at the inception of his or her four-year term, to either select and appoint a new assistant principal or to retain an

incumbent. If the principal elects not to retain the incumbent, he or she is required to inform the incumbent within 30 days of the effective date of her contract. If the principal chooses to retain the incumbent, however, no further action is necessary. Lewis retained the plaintiff through her initial four-year term, and again in 2005, when her contract was renewed for a second four-year term.

¶ 7     As an assistant principal, the plaintiff's responsibilities included handling discipline, acting as a mentor and role model for students, assisting Lewis in all matters related to school operations and security, and "tak[ing] charge of the school" whenever Lewis was out of the building. The plaintiff was placed in charge of Goodlow's "school based problem solving" program, an intervention plan for children with behavioral issues. Additionally, the plaintiff was designated a "mandated reporter" of child abuse under the Abused and Neglected Child Reporting Act (325 ILCS 5/4 (West 2006)), which requires all school personnel to immediately report any reasonable suspicion of child abuse to the DCFS. The Board's policy provided that the failure of a mandated reporter to report abuse could result in sanctions. As part of his training, the plaintiff was given materials detailing this policy. Included in the policy's definition of "abused child" is any child subjected to "excessive corporal punishment" at the hands of a person responsible for the child's welfare. The policy also stated that, when a teacher or administrator was alleged to be the perpetrator of the abuse, the principal or assistant principal should initially conduct a "brief fact-finding inquiry with the alleged victim, the alleged offender, and any witnesses," so that the principal could prepare an incident report for the Chicago Public Schools. The assistant principal was also required to contact the police, and then forward the incident report along with any police report to the DCFS. Finally, the policy expressly barred any teachers or administrators from being "discriminated against or disciplined for making a good faith report to DCFS."

¶ 8     On May 16, 2007, Lewis was absent from Goodlow, and the plaintiff was acting as principal in her place. He was in his office when Arlene McMurray, a veteran reading teacher, came in and informed him that she was walking down the corridor when she saw a special education teacher swiftly kick a second-grade boy in the back of his legs, causing the child to fall backwards and strike his head on the floor. The child, "D.D.," had been diagnosed with ADHD and bipolar disorder and was participating in Goodlow's problem solving program. McMurray immediately confronted the special education teacher and asked her what she was doing, but the teacher looked at her in a startled manner and did not respond. McMurray related the incident to another nearby teacher, who told her that she was required to report suspected abuse.

¶ 9     The plaintiff testified that he asked McMurray several times to repeat what she had seen, and each time she emphasized that she had watched the special education teacher kick the legs out from under the child in a sweeping motion and that the student had fallen to the ground, bumping his head. The plaintiff explained to McMurray that, under Board policy, she was a mandated reporter of child abuse and was required to contact the DCFS hotline to report the alleged abuse she had witnessed. McMurray refused, however, contending that she had already fulfilled her reporting obligation by informing the plaintiff of what she had seen. The plaintiff informed her that she had an independent obligation to report the abuse, but McMurray again

refused. The plaintiff called the Board's law department, and an investigator spoke directly with McMurray about her responsibility to report the suspected abuse. When she again refused to report the abuse to the DCFS, the investigator instructed the plaintiff to make the report. In her testimony, McMurray explained that she was reluctant to report the abuse herself, because she feared disciplinary action from Lewis.

¶ 10    The plaintiff testified that he subsequently spoke with D.D. about the incident in the presence of another staff member. The child related that the special education teacher had kicked his legs out from under him, causing him to fall on his back. The plaintiff examined the back of D.D.'s head and found a small lump. He then sent D.D. back to class. The plaintiff understood that Board policy required him to report the abuse immediately, but that it also precluded him from notifying the child's parent or the suspected perpetrator of the allegations. The plaintiff reported the suspected abuse to the DCFS hotline and to the police department. He later prepared an incident report which he provided to "other Board departments," as mandated by Board policy. According to the plaintiff, based upon his training, his knowledge of Board requirements, and state law, he believed that he could lose his job if he did not report the abuse.

¶ 11    Next, the plaintiff attempted to contact Lewis. He testified that, when he reached her, she severely reprimanded him for reporting the incident to the DCFS and the police. Lewis told plaintiff that he had mishandled the situation because the special education teacher was a trained therapist who was engaging in an effective form of "role playing" therapy with D.D., which had been approved by the child's mother. The plaintiff testified, however, that in his experience with the school-based problem solving program, he was unaware of any therapy that condoned intentional tripping or use of force against a student. Lewis told the plaintiff that she would take care of the matter the following day and then she hung up on the plaintiff when he tried to further explain his position.

¶ 12    According to the plaintiff, when Lewis returned to school on May 17, 2007, she was hostile and uncommunicative toward him and would no longer discuss the matter. Prior to the abuse report, Lewis had always been supportive of the plaintiff and the two enjoyed a friendly professional relationship. The record indicates that, in each of his evaluations during the period covering the 2001-02 through the 2005-06 school years, the plaintiff received very favorable ratings, meeting or exceeding Lewis's expectations. The plaintiff testified that, from the time that he made the abuse report to the DCFS, however, both Lewis and the Board began a campaign of harassing behavior against him.

¶ 13    On May 18, 2007, the plaintiff was attending a professional development program when he was unexpectedly contacted by Lewis's assistant and told to return to Goodlow. The plaintiff testified that this was the second half of a two-part program that had previously been approved by Lewis and that the program was required for him to retain the necessary certification to serve as a principal or an assistant principal. The plaintiff testified that Lewis was also attending the program, but she did not speak to him.

¶ 14    On August 16, 2007, Lewis notified the plaintiff that she was lowering the performance rating on his annual evaluation for the 2006-07 school year. As a basis for her decision, Lewis told the plaintiff that he had, among other infractions: failed to properly close out summer

school for 2007; left school early or taken days off without properly notifying her; been confrontational with, and failed to get along with, several coworkers; failed to participate in staff development and after-school parent activities; and mishandled the report to the DCFS, by failing to properly investigate the matter when there were three teachers involved. The plaintiff denied that these allegations were true and testified that he believed his lowered rating was solely the result of his report of the suspected abuse. According to the plaintiff, he had been evaluated every year from 2001 through 2005, and his evaluations were uniformly positive. He had never been verbally reprimanded or otherwise disciplined under the Board's "Employee Discipline and Due Process Policy" (employee discipline policy). When the plaintiff received his 2006-07 ratings, he found that they were "dismal," and he was confused and upset because he had done nothing differently than in prior years.

¶ 15 The plaintiff was also informed that he was being "diminished" to the position of a full-time social studies teacher. He was given written instruction to prepare weekly lesson plans, enter grades, and to turn in all of his keys except those to his classroom. The plaintiff testified that he was never consulted about this decision and that he had neither the training nor the required certification to teach social studies. He stated that, despite his lack of qualification, he attempted to research the subject and get lesson plans from another teacher. However, he never received the lesson plans or any guidance from Lewis or anyone else. According to the plaintiff, he was ineffective as a social studies teacher and received a "write-up" around November 2007, for failure to turn in lesson plans.

¶ 16 The plaintiff testified that, about August of 2007, he began suffering from back problems, causing intermittent excruciating pain. In addition, his mother was suffering from deteriorating health. On September 17, 2007, he notified Lewis that he was taking a five-week leave of absence because of his back pain. On September 28, 2007, Lewis wrote a letter to one of the Board's labor relations attorneys informing him of the plaintiff's absence and describing him as "AWOL." The plaintiff testified that, at this point, he knew he was being subjected to retaliatory treatment. The plaintiff contacted Tom Krieger, a labor relations employee of the Board, stating that he had applied for family medical leave and that he was not AWOL. According to the plaintiff, Krieger told him that nothing was being done about Lewis's letter. Krieger also inquired whether the plaintiff was looking for another job, suggesting that he "wouldn't want to be somewhere where [he is] not wanted." The plaintiff returned to school in late October 2007, from his medical leave.

¶ 17 On September 26, 2007, the plaintiff wrote a letter to the Board's labor relations department informing them that he believed Lewis had retaliated against him because he reported the suspected abuse of D.D. Attached to the letter was the correspondence from Lewis notifying the plaintiff of his lowered evaluation. The Board commenced an inquiry into the plaintiff's claims. One of its investigators Ray Poloko, was assigned to the matter. When efforts to contact the plaintiff were unsuccessful, Poloko's investigation consisted solely of an interview with Lewis. In her interview, Lewis reiterated the reasons for her decision to lower the plaintiff's rating and she also provided documentation supporting her rationale, including several notes from the special education teacher who had kicked D.D., revealing disputes between herself and the plaintiff, some of which predated the abuse report. The documents also

showed that, at the time of the alleged abuse, the special education teacher was engaged in a form of empathy training with D.D., who had been physically aggressive toward other students and had proven to be a consistent disciplinary problem. On October 29, 2007, Poloko issued a written report, concluding that the plaintiff's claim of retaliation was unfounded and that he made allegations leading to the investigation which "he knew or should have known were false." The plaintiff testified that he was upset to learn that the legal department investigator whom he had contacted for guidance on the day of the abuse report had concurred in the finding that he made false statements.

¶ 18       In her testimony, Lewis admitted that the plaintiff was correct in notifying the DCFS of the suspected abuse of D.D., because that was what mandated reporters were trained to do and what the law required. However, Lewis also acknowledged her prior statement that the plaintiff had not properly handled the matter, because he failed to conduct a brief fact-finding inquiry with the victim, the offender, and other witnesses, as stated in the policy materials. She testified that the police came to Goodlow on May 18, 2007, to investigate the abuse report and determined that the report was unfounded. Lewis also described how the plaintiff had failed to properly close out summer school, neglected to turn in required reports, was absent or left the building without notifying her, and was unable to get along with other school personnel. She admitted, however, that the plaintiff had been on approved medical leave beginning September 17, 2007.

¶ 19       In December of 2007, disciplinary action was initiated against the plaintiff for "incompetently or inefficiently" performing his duties and making false statements leading to the investigation of Lewis. Following a hearing, the plaintiff was issued a written reprimand.

¶ 20       On December 27, 2007, the plaintiff's mother died, and he took a bereavement leave of absence until early January of 2008. On January 9, 2008, after the plaintiff returned from bereavement leave, Lewis sat in to observe his social studies class. Lewis testified that, at the beginning of class, the plaintiff was talking on his telephone with his back to the class and that he never addressed the students or responded to their questions. According to Lewis, the plaintiff then moved to his computer, again without any instruction to the class. According to the plaintiff, however, Lewis's statements were untrue; he actually was on his computer conducting research and trying to devise lesson plans while the students were working on an assignment he had given them. Based upon her observations, and unbeknownst to the plaintiff, Lewis filed a written request for an emergency removal of the plaintiff from Goodlow. The request also noted that the plaintiff had been absent for 58 days.

¶ 21       On January 14, 2008, area instructional officer Analila Chico sent the plaintiff a prediscipline notice, alleging excessive absence or tardiness, noting that since October 22, 2007, he had been absent approximately 36 days. The plaintiff denied these assertions, maintaining he was on approved medical and bereavement leaves.

¶ 22       On January 15, 2008, Lewis reassigned the plaintiff from teaching duties to supervising students who were placed on in-school suspension. According to the plaintiff, this position did not exist prior to this time. The detention room in which the plaintiff was assigned had no teacher's desk and no comfortable chair. The plaintiff testified that he was taunted by the students, who threw items at him, used vulgar language, and stated that he was nothing but a

substitute teacher and that they no longer had to listen to him. Lewis also instructed the plaintiff to turn in all of his extra keys, including his elevator key, unless he could produce a physician's note.

¶ 23 On February 15, 2008, Lewis initiated discipline against the plaintiff for allegedly grabbing a student and "slinging her book bag." The discipline notice stated that the student had disobeyed the plaintiff's instruction. The plaintiff denied grabbing the student and testified that Lewis never sought his version of events.

¶ 24 In May 2008, Lewis again attempted to discipline the plaintiff, charging him with failing to supervise students and of assaulting a student. According to the plaintiff, he was trying to break up a fight between two students when he was "bum rushed" by one student, reinjuring his back. He filed a police report as to the incident, contacted an ambulance, and was taken to the hospital. Contrary to the usual practice, he was not accompanied by any other school personnel when he went to the hospital. The plaintiff later qualified for workers' compensation as a result of his injuries. The plaintiff testified that he received a letter from the State's Attorney's office concerning the incident, but elected not to prosecute the student, who was receiving help for anger-management issues. The plaintiff also learned that someone had filed assault charges against him as a result of the incident; however, those charges were ultimately dismissed. Eventually, there was a finding by the Board that he was injured breaking up a student fight. Following the incident, the plaintiff went on a medical and family leave of absence from May 14 through mid-December of 2008.

¶ 25 In subsequent correspondence, Chico wrote to Krieger stating that "the issues regarding [the plaintiff] are never-ending" and that she did not have time to handle the constant disciplinary situations that "[Lewis] wants taken against him." On May 15, 2008, Krieger responded that, under the disciplinary code, all disciplinary action beyond a cautionary notice had to come from Chico. Krieger encouraged Chico to follow through on the prior disciplinary action, noting that they "need to get a couple suspensions in the book on this guy so that we can eventually seek his termination."

¶ 26 When the plaintiff attempted to return from medical leave in mid-December of 2008, the Board's human resources department informed him that he was not shown to be an employee at Goodlow. The plaintiff subsequently learned that he was no longer attached to Goodlow and would have to report any further issues to the Board. While the plaintiff was on leave, he was replaced by an interim assistant principal on the basis that, according to Lewis, the plaintiff had overextended his leave of absence. Lewis also stated that she did not want the plaintiff in her building because he had "assault charges pending from the counsel general." However, the plaintiff testified he had no charges pending. Further, the plaintiff denied ever being notified by human resources department that he had overextended his medical leave.

¶ 27 On December 16, 2008, Lewis was offered another four-year contract as principal of Goodlow. The human resources department advised Lewis to reinstate the plaintiff as assistant principal, on the basis that "[h]is job protection is tied to your current contract."

¶ 28 When the plaintiff returned to his position in January 2009, Lewis directed him not to walk around the school and to refrain from speaking to any teachers, students, or parents. The plaintiff testified that as he encountered teachers, staff, and the interim assistant principal, all

- 8 -

of whom expressed surprise to see him, stating that they had been informed at staff and school council meetings that he had been fired.

¶ 29 On January 16, 2009, Lewis notified the plaintiff that "pursuant to the guidelines of the principal contract *** that you are officially release [sic] from this new contract approved by Goodlow LSC December 16, 2008," effective July 1, 2009.

¶ 30 From his return in January until after his departure from Goodlow in June 2009, the plaintiff was subjected to disciplinary censures for alleged negligence in supervising students and insubordination. In one instance, the plaintiff had attempted to discipline a student for sexually harassing a fellow student, but it was the plaintiff who was disciplined, not the offending student. In another instance, the plaintiff attempted to break up a fight between three students as there were no security officers present. He again sustained injury to his back requiring a leave of absence, for which he received a written reprimand from Chico.

¶ 31 Following the close of the evidence, the Board moved for directed verdict, which the trial court denied. Following closing arguments, the jury returned a verdict for the plaintiff on both his claim of retaliatory discharge and his claim for a violation of the Act, awarding damages in the amount of $1,000,500. Subsequently, the trial court denied the Board's motions for judgment *n.o.v.*, a new trial, and a remittitur. This appeal followed.

¶ 32 The Board first argues that the trial court erred in denying its motions for summary judgment, directed verdict, and judgment *n.o.v.*, on the plaintiff's retaliatory discharge claim. However, as there has been a trial on the merits in this case, the denial of the Board's motions for summary judgment and directed verdict have merged into the final judgment (*Thurmond v. Monroe*, 235 Ill. App. 3d 281, 285 (1992); see also *Wade v. Rich*, 249 Ill. App. 3d 581, 591 (1993)). Consequently, our review is confined to the denial of the Board's motion for judgment *n.o.v.*

¶ 33 A judgment *n.o.v.* is proper only when all of the evidence, viewed in a light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 178 (2006) (quoting *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967)). Where there is uncontradicted evidence, which, viewed most favorably to the plaintiff, establishes a complete defense, the court is justified in granting the defendant's motion for a judgment *n.o.v. Harris v. Thompson*, 2012 IL 112525. As the denial of a motion for judgment *n.o.v.* turns upon a question of law, we employ a *de novo* standard of review. *Thornton v. Garcini*, 237 Ill. 2d 100, 107 (2009).

¶ 34 The Board argues that the plaintiff could not maintain an action for retaliatory discharge because he was not an at-will employee. We agree. In order to state a valid claim for retaliatory discharge, an employee must establish that (1) the employer discharged him, (2) in retaliation for the employee's activities, and (3) that the discharge violates a clearly mandated public policy. *Fellhauer v. City of Geneva*, 142 Ill. 2d 495, 505 (1991); *Barr v. Kelso-Burnett Co.*, 106 Ill. 2d 520, 529 (1985). Courts in this state have continued to maintain the narrow scope of the retaliatory discharge action (see *Buckner v. Atlantic Plant Maintenance, Inc.*, 182 Ill. 2d 12, 19-20 (1998) (collecting cases); *Barr*, 106 Ill. 2d at 525; *Bajalo v. Northwestern University*, 369 Ill. App. 3d 576 (2006)), confining the tort to the discharge of an at-will

employee. See, *e.g.*, *Zimmerman v. Buchheit of Sparta, Inc.*, 164 Ill. 2d 29 (1994); *Krum v. Chicago National League Ball Club, Inc.*, 365 Ill. App. 3d 785 (2006); *Bajalo*, 369 Ill. App. 3d 576.

¶ 35    In this case, the Board maintains that the plaintiff was not an at-will employee but rather was hired for a definite term of employment, which expired at the end of the principal's four-year term, subject to a renewal at the discretion of the principal. The plaintiff disputes this contention and asserts that he was an at-will employee, pointing to the plain language of the Board rules, and particularly the fact that his employment as assistant principal could continue automatically unless the Board took affirmative steps to end it. The evidence supports the Board's contention.

¶ 36    Section 4-3(c) of the Board rules states as follows:

> "*Assistant Principles*. Assistant principals are full-time employees with administrative certificates *** who are recommended for hire by a contract principal, [or] interim principal *** to assist contract, interim, or acting principals in the performance of their duties as the instructional and administrative leader of a student attendance center. Assistant principals may be assigned direct instructional responsibilities."

Assistant principals are categorized as "discretionary" or "quota." The parties agree that the plaintiff was a quota assistant principal, described as follows:

> "*Quota Assistant Principals*. Quota assistant principals are 210-funded assistant principals who are recommended for hire by a contract or interim principal and whose term of assignment as a quota assistant principal *ends at the expiration of the contract principal's contract, the retirement of the contract principal, the removal or dismissal of the contract principal ***. Quota assistant principals whose term of assignment ends under this Rule shall be displaced in accordance with the Board's Assignment and Appointment of Teachers and Principals Policy." (Emphasis added.)

¶ 37    In support of his argument that his employment could continue indefinitely, the plaintiff relies upon the following language from the Board's "Assignment and Appointment of Teachers and Principals Policy":

> "When a principal's contract is renewed, the principal may select and appoint a new assistant principal or retain the incumbent assistant principal. If the principal chooses to retain the incumbent assistant principal, no formal action is required. If the principal chooses not to retain the incumbent assistant principal, the principal must notify the incumbent assistant principal in writing by the later of the two following dates: ***."

¶ 38    The section goes on to require notification of nonretention within 30 days after the principal's contract is renewed, or 30 days prior to the expiration of the principal's current contract. If the assistant principal is not retained, he "will remain in his *** position" until the last day of the pay period in which the principal's contract expires. Finally, if the assistant principal does not receive removal notification as required, the section states that he "shall be retained" for the duration of the principal's renewed contract.

¶ 39    Initially, we reject the plaintiff's assertion that the above language confers any expectation of employment beyond the four-year term. In considering this question, the test is whether the

terms governing the length of employment are sufficiently clear and definite to overcome the assumption that the employment is at-will. *Robinson v. BDO Seidman*, *LLP*, 367 Ill. App. 3d 366 (2006). In this case, the Board rules unequivocally state that the assistant principal's term will end when the principal's contract expires or when she retires or is otherwise removed. This is sufficiently clear to establish employment for a set term; namely, the contract term of the principal. See *id.*; *Johnson v. George J. Ball, Inc.*, 248 Ill. App. 3d 859 (1993). We also note that, in his testimony, the plaintiff admitted his understanding that he had a four-year term and that Lewis could choose not to renew his employment at the end of that term.

¶ 40    Further, a review of the Board rules indicates that the plaintiff's employment was not at-will. Sections 4-1(c) and (c)(9) of the rules, governing personnel matters, dictate that the Board "*shall* exercise all authority" to dismiss nonprobationary assistant principals "for cause." (Emphasis added.) Similarly, section 4-7(b)(4), pertaining to discipline and dismissal of employees, states that assistant principals may be dismissed "for cause" upon recommendation of the chief executive officer and in accordance with the Board's discipline policy. In section III(3) of the Board's employee disciplinary policy, entitled "definitions," assistant principals are excluded from an enumeration of at-will employees, while acting or associate principals are expressly included. These factors militate against the plaintiff's argument that he was terminable at will.

¶ 41    In addition, where an employer provides an employee with a clearly articulated progressive disciplinary procedure, outlined in unequivocal and mandatory language, courts have found the creation of contractual rights. See *Long v. Tazewell/Pekin Consolidated Community Center*, 215 Ill. App. 3d 134 (1991); see also *Duldulao v. Saint Mary of Nazareth Hospital Center*, 115 Ill. 2d 482, 489-90 (1987). Here, the Board's employee discipline policy articulates a detailed procedure under which assistant principals "shall" be notified in writing prior to discipline and "shall" be afforded a hearing and ultimately disciplined if found to be necessary. Suspension procedures, and rules outlining how an assistant principal "shall" be discharged, are similarly controlled and detailed. Based upon these terms, we conclude that the plaintiff was a contract employee with an expectation of a set period of employment, terminable for cause.

¶ 42    Nonetheless, the plaintiff refers us to the "Introduction and Scope" section of the disciplinary policy, purporting to disclaim the disciplinary procedures as placing any limitation or restriction upon the Board's right to "discharge any employee with or without cause." However, this general policy statement, standing alone, is insufficient to take precedence over the more detailed language directly addressed to assistant principals, making them subject to discharge only for cause. We agree with the Board that, where general provisions of a contract tend to negate more specific terms applicable to the same subject, the specific terms will govern. See, *e.g.*, *Perman v. ArcVentures, Inc.*, 196 Ill. App. 3d 758 (1990).

¶ 43    Having found that the plaintiff was subject to a definite contractual term of employment, and that the Board exercised its option not to renew that term, we necessarily conclude that the plaintiff was not an at-will employee. In *Bajalo*, this court reviewed Illinois law pertaining to retaliatory discharge and held that this tort applies only to at-will employees and not to employees, such as the plaintiff, whose contractual term of employment is not renewed. See

*Bajalo*, 369 Ill. App. 3d 576. Accordingly, we reverse the judgment for the plaintiff on the claim of retaliatory discharge.

¶ 44    We next turn to the Board's arguments regarding the verdict under the Act. After finding in favor of the plaintiff on that claim, the jury awarded him damages of $100,000 for emotional distress "as a result of retaliatory actions taken against him," but "apart from his discharge," for the period of January 1, 2008, through June 30, 2009. The Board first contends that the trial court erred in denying its motion *in limine*, under which it sought to exclude any evidence of retaliatory acts prior to January 9, 2009. The Board asserts that, because the complaint was filed on January 9, 2010, the one-year statute of limitations under the Act began running on January 9, 2009, and therefore, the evidence of retaliation before that time was an abuse of discretion and tainted the jury's verdict. With regard to the evidence of retaliatory conduct from May through December of 2007, the Board further points out that the Act did not extend a right of action against public employers until January 1, 2008. See Pub. Act 95-128 (eff. Jan. 1, 2008) (amending 740 ILCS 174/5 (West 2006)). Accordingly, the admission of that evidence was an abuse of discretion and operated to prejudice the jury's decision. For the reasons which follow, we reject this argument.

¶ 45    The decision of whether to grant a motion *in limine* rests within the sound discretion of the trial court and will not be disturbed on appeal unless that discretion is abused. *Martinez v. Elias*, 397 Ill. App. 3d 460, 467 (2009). An abuse of discretion will be found only if the trial court's ruling was arbitrary, unreasonable, or ignored recognized principles of law, or if no other reasonable person would take the position adopted by the court. *Schmitz v. Binette*, 368 Ill. App. 3d 447, 452 (2006).

¶ 46    The parties do not dispute that actions under the Act against public employers are subject to the one-year limitations period set forth in the Local Governmental and Governmental Employees Tort Immunity Act. See 745 ILCS 10/8-101(a) (West 2010); *Padilla v. County of Cook*, 100 F. Supp. 2d 1145, 1147 (N.D. Ill. 2000). In general, the limitations period begins to run when the interest at issue is invaded. *Pavlik v. Kornhaber*, 326 Ill. App. 3d 731, 744-45 (2001). However, under the "continuing tort" or "continuing violation" theory, where the tort involves continuous or repeated injurious behavior, by the same actor and of a similar nature, the limitations period is held in abeyance and the plaintiff's cause of action does not accrue until the date the final injury occurs or the tortuous acts cease. *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 278 (2003); *Pavlik*, 326 Ill. App. 3d at 745. A continuing tort is not established by ongoing injuries resulting from one discreet act (see *Hyon Waste Management Services, Inc. v. City of Chicago*, 214 Ill. App. 3d 757, 763 (1991)), but instead involves viewing the defendant's conduct as a series of tortuous acts amounting to a continuous whole. *Feltmeier*, 207 Ill. 2d at 279. The continuing tort theory has been held applicable to claims for emotional distress. *Id.* at 281.

¶ 47    In this case, the basis for the plaintiff's claim under the Act was that from the period immediately following his report of suspected abuse in May 2007, through the nonrenewal of his contract in January of 2009, and to the end of his employment in June 2009, he was subjected to a continuous pattern of petty harassment by the Board in direct retaliation for that report. The plaintiff demonstrated that in the years he was employed by the Board prior to the

- 12 -

report, he had received satisfactory to superior evaluations and had a good working relationship with Lewis. Beginning in August 2007, his performance rating was lowered, he was demoted, and his integrity questioned in the context of his report of retaliation; he was made to undergo humiliation in front of his peers and subjected to repeated, questionable disciplinary censure and suspension with little or no opportunity to respond, culminating in the nonrenewal of his contract. He alleged continuing retaliatory conduct up until his last day of work. We conclude that the evidence established a continuous course of conduct at the hands of Lewis and other Board employees, which gave rise to the plaintiff's claim under the Act. Accordingly, the court did not abuse its discretion in denying the Board's motion *in limine* and allowing the evidence of retaliatory conduct dating back to January of 2008.

¶ 48 Similarly, we find no error in the admission of retaliatory conduct in the period following May 16, 2007, when the plaintiff made his report to DCFS and the police, until December 2007. Recognizing that the plaintiff had no right of action against the Board under the Act until January 1, 2008, the trial court gave a limiting instruction specifically admonishing the jury that the plaintiff could not recover damages under the Act for any claimed retaliatory acts occurring prior to that date. Additionally, the evidence of Lewis's increasing hostility toward the plaintiff in that period, his lowered performance rating, the sudden demotion, and the disciplinary action taken against him were all highly probative to show the repercussions directly following the report of abuse and the Board's continuing motive of retaliation. See *Reinneck v. Taco Bell Corp.*, 297 Ill. App. 3d 211, 214 (1998). Accordingly, there was no abuse of discretion in admitting this evidence, subject to the limiting jury instruction.

¶ 49 Next, the Board argues that it is entitled to a new trial because the trial court erroneously permitted the use of a single verdict form for both the retaliatory discharge claim and the claim under the Act. As a result, it is unclear which damages applied to which of the two causes of action. See *Magnani v. Trogi*, 70 Ill. App. 2d 216 (1966). We agree, but solely with regard to the issue of damages.

¶ 50 The verdict form begins by setting out the jury's finding for the plaintiff on the respective claims of retaliatory discharge and violation of the Act. The form then states as follows:

"We assess damages in the sum of $1,000,500, itemized as follows (total of a through c):

a. We assess Plaintiff's damages for the value of time, salary and benefits lost, and the present cash value of the salaries and benefits reasonably certain to be lost in the future as result of his discharge to be: $600,500.

b. We assess Plaintiff's damages for the emotional distress he experienced and is reasonably certain to experience in the future as a result of his discharge term to be: $300,000.

[Answer the following question only if you found in favor of Plaintiff *** on his claim under the Act]:

c. We assess Plaintiff's damages for the emotional distress he experienced and is reasonably certain to experience as result of retaliatory actions taken against [him]

from January 1, 2008, to June 30, 2009, other than his discharge of employment to be: $100,000."

¶ 51　　The Board argues, as the plaintiff argued at the jury instruction conference, that this single form makes it impossible to ascertain what amount of damages, if any, were awarded for the plaintiff's discharge or cessation of employment under the Act, as opposed to his discharge under the common law claim of retaliatory discharge.

¶ 52　　Indeed, the Act affords far greater relief than the tort of retaliatory discharge (see *Callahan v. Edgewater Care & Rehabilitation Center, Inc.*, 374 Ill. App. 3d 630, 634 (2007)). It provides for recovery if an employer takes "*any action* against an employee" for making a good faith report of suspected illegal activity. (Emphasis added.) 740 ILCS 174/30, 15 (West 2004). Further, the relief provided can extend to whatever is necessary to make the employee whole, including, but not limited to, damages, back pay, reinstatement, fees and costs. 740 ILCS 174/30 (West 2004). We conclude that, based upon the clear and unambiguous language of the statute, an employee alleging an adverse employment action by his employer in retaliation for a good-faith report of a suspected violation of Illinois law can state a valid claim for recovery under the Act. Although there is very little case law interpreting our statute, courts in other jurisdictions have entertained such claims under similar whistleblower laws for the nonrenewal of an employment contract motivated by retaliatory animus. See, *e.g.*, *Edwards v. Gwinnett County School District*, No. 1:11-CV-2581-TWT, 2013 WL 5492953 (N.D. Ga. Sept. 30, 2013); *Parks v. City of Brewer*, 56 F. Supp. 2d 89 (D. Me. 1999); see also *Sokn v. Fieldcrest Community Unit School District No. 8*, No. 10-1122, 2011 WL 2533793 (C.D. Ill. June 27, 2011) (allegation of failure to renew employment contract). Based upon our review of the record, there was sufficient evidence in this case to sustain a finding that the plaintiff suffered an adverse employment action, in the form of the nonrenewal of his employment contract, resulting from his report of child abuse. However, the verdict form fails to specify whether the damages resulting from the plaintiff's "discharge" were contemplated under the retaliatory discharge claim or under the more expansive Act. Accordingly, in light of our reversal of the retaliatory discharge finding, it is necessary to remand for a new trial on the issue of damages under the Act. Because there will be a new determination as to damages, we need not reach the Board's contention regarding the denial of its motion for a remittitur.

¶ 53　　The Board also filed a notice of appeal, which was consolidated with this case, from the trial court's order of February 7, 2013, awarding the plaintiff attorney fees, costs, and prejudgment interest on his back pay. However, it has failed to file any briefs or otherwise make any argument regarding these matters. We therefore deem the matters to be forfeited under Illinois Supreme Court Rule 341(h)(7) (eff. Feb. 6, 2103), and will dismiss the consolidated appeal.

¶ 54　　For the foregoing reasons, we reverse the judgment in favor of the plaintiff on his retaliatory discharge claim, affirm the finding of the Board's liability under the Act, vacate the award of damages, and remand this case for a new trial solely on the issue of damages under the Act, including, but not limited to, those resulting from the decision of the Board to terminate the plaintiff's contract.

¶ 55         No. 1-12-3744, Affirmed in part, reversed in part, vacated in part, and remanded.

¶ 56         No. 1-13-0605, Appeal dismissed.