2020 IL App (1st) 182551-U
Order filed: January 31, 2020

FIRST DISTRICT
FIFTH DIVISION

Nos. 1-18-2551 & 1-19-1485 (cons.)

**NOTICE**: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| LORENZO DAVIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 16 L 5088 |
| | ) | |
| CITY OF CHICAGO, | ) | Honorable |
| | ) | James A. Snyder, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Hoffman and Justice Delort concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The jury awarded plaintiff $2 million damages for emotional distress in his action against the City for violations of the Whistleblower Act and common-law retaliatory discharge. We reduced the $2 million damages award for emotional distress to $100,000, subject to consent of plaintiff.

¶ 2    Plaintiff, Lorenzo Davis, filed a complaint against defendant, the City of Chicago (the City), alleging violations of sections 15(b) and 20 of the Whistleblower Act (740 ILCS 174/15(b), 174/20 (West 2016)), and common-law retaliatory discharge. A jury found in favor of plaintiff on all three claims and awarded him $800,000 in compensatory damages for lost earnings, salaries and benefits and $2 million in damages for emotional distress. The City filed a post-judgment

motion for judgment notwithstanding the verdict (judgment *n.o.v.*) or a new trial on damages or, in the alternative, remittitur. The court denied the motions for new trial and judgment *n.o.v.* The court granted the motion for remittitur in part, reducing the salary and benefits award by $48,530, which plaintiff accepted, but denying remittitur of the $2 million in damages for emotional distress. The court entered judgment in the total amount of $2,751,469.96, representing the $2 million in emotional distress damages and $751,469.96 in compensatory damages for salary and benefits.

¶ 3        The City appeals, arguing that the $2 million award for emotional distress also should be remitted because it is outside the range of fair and reasonable compensation, resulted from passion or prejudice, shocks the judicial conscience, and is barred by the prohibition in section 2-102 of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/2-102 (West 2016)) on punitive and exemplary damages against Illinois municipalities. We affirm the finding of liability against the City and the award as reduced by the trial court for salary and benefits, but reduce the $2 million damages award for emotional distress to $100,000. If plaintiff does not consent to the remittitur in accordance with our decision, we will remand this matter to the trial court for a new trial on the question of damages for emotional distress only.

¶ 4                                    I. Background

¶ 5                              A. Plaintiff's Complaint

¶ 6        Plaintiff filed a fourth amended complaint alleging that the City terminated him from his position as a supervising investigator for the Independent Police Review Authority (IPRA) because he had made findings that various police officers had engaged in "misconduct" and he had refused to participate in attempts to cover up the police misconduct. In count I, plaintiff contended that the

City's termination of him violated sections 15(b) and 20 of the Whistleblower Act. Section 15(b) provides:

> "An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation." 740 ILCS 174/15(b) (West 2016).

¶ 7 Section 20 provides:

> "An employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation, including, but not limited to, violations of the Freedom of Information Act." 740 ILCS 174/20 (West 2016).

¶ 8 In count II, plaintiff contended that the City's termination of him constituted common law retaliatory discharge. See *Taylor v. Board of Education of the City of Chicago*, 2014 IL App (1st) 123744, ¶ 34 (to state a claim for retaliatory discharge, the employee must establish that the employer discharged him in retaliation for his activities, and that the discharge violates a clearly mandated public policy).

¶ 9                      B. Trial Testimony

¶ 10                      1. Plaintiff's Testimony

¶ 11 Plaintiff was 68 years old at the time of trial and had lived his entire life in Chicago. He graduated from the University of Illinois-Chicago in 1972 and became a full-time teacher in various Chicago public schools. In 1981, plaintiff changed professions and joined the Chicago Police Department (CPD). He spent 23 years in the CPD in various ranks, including patrol officer,

tactical officer, detective, sergeant, lieutenant, and finally commander. During his police career, plaintiff also became an attorney, graduating from The John Marshall Law School in 1991.

¶ 12    Plaintiff retired from the CPD in 2004, and practiced law for several years and taught classes for campus police officers at the University of Chicago, Harold Washington College, Chicago State University, and Governors State University.

¶ 13    In 2007, plaintiff applied for a position with the IPRA. The IPRA is an entity separate from the CPD that investigates officer-involved shootings and allegations of excessive force. Plaintiff was hired as an entry-level investigator in 2008, and he worked on a team of about six people. In 2010, plaintiff was promoted to the supervising investigator of his team.

¶ 14    Plaintiff explained the process used to conduct an excessive force investigation. Initially, when a complaint comes in, the team of investigators interviews witnesses, views medical records and other reports, and downloads all relevant documents into a computer system. At the end of the investigation, the investigators prepare a report summarizing all the evidence and give their conclusion (based on a preponderance of the evidence standard) as to whether the officers involved engaged in excessive force. The summary report is signed by the supervising investigator. When the investigator finds that the allegation of excessive force is sustained, the summary report (containing the sustained finding) is forwarded to the IPRA deputy chief for a determination of a recommended penalty. The finding and recommended penalty is then forwarded to the chief administrator of the IPRA for final approval.

¶ 15    When plaintiff first joined the IPRA in 2008, Ilana Rosenzweig was the chief administrator. Ms. Rosenzweig rarely disagreed with the investigators' sustained findings. In 2014, Ms. Rosenzweig retired, and Scott Ando became the chief administrator for the IPRA. According

to plaintiff, Mr. Ando disagreed with every one of his sustained findings of excessive force and ordered him to change those findings.

¶ 16   Plaintiff testified about two specific cases where he found that officers were guilty of excessive force. One case was the January 7, 2013, fatal shooting of an unarmed juvenile named Cedrick Chatman. Plaintiff worked on this case with investigator Grace Wilson. They located three video recordings of the shooting. Plaintiff described the videos for the jury. The videos showed Officer Fry and Officer Toth pull up in their police car next to Mr. Chatman's car "during the day" on January 7, 2013. Mr. Chatman exited the vehicle and began running away, with Officer Toth a couple of feet behind him. Mr. Chatman ran between two parked cars. Officer Fry, who was about 30 or 40 feet away in the middle of the street, took out his gun and shot and killed Mr. Chatman. Mr. Chatman had a black cell phone box in his hand at the time of the shooting, but he did not have a gun.

¶ 17   After finishing their investigation, plaintiff and Ms. Wilson wrote a summary report on October 7, 2014, in which they found that Officer Fry was not justified in shooting Mr. Chatman. They forwarded the summary report to Deputy Chief Steven Mitchell, who subsequently called plaintiff into his office in July 2015 and yelled at him to change the finding. In response, plaintiff added a line to the summary report stating, "First Deputy Chief Steven Mitchell recommends that this case be exonerated." Plaintiff added the line because he thought that he would be "guilty of insubordination if [he] did not change the report." Plaintiff signed the report but indicated thereon that he was doing so "under duress."

¶ 18   Plaintiff described another case he investigated involving a juvenile with the initials C.W. C.W. had some marijuana in his pocket and ran away when he saw Officer Hugo Salcedo. According to C.W., Officer Salcedo chased him, took out his police baton, and "rapped him across

the head, damaging his nose" and injuring his eye socket. Plaintiff obtained C.W.'s booking photo, which showed damage to his eye and nose. Plaintiff testified that "it appeared that he had been hit with a baton-like object, like he said." Plaintiff worked on the case with Investigator Tiffany Williams, and they issued a summary report sustaining a finding of excessive force against Officer Salcedo.

¶ 19    Plaintiff testified that he received performance evaluations twice a year while working for the IPRA, and that all of them were positive until his final written evaluation dated June 25, 2015, and signed by Deputy Chief Mitchell. In the June 25, 2015, evaluation, Deputy Chief Mitchell found that plaintiff had performed "marginally" with regard to his quality of work. Deputy Chief Mitchell found that plaintiff "has repeatedly exhibited an inability to be flexible and repeatedly refuses to comply with decisions different from his made by IPRA management directing him to change improper findings. [Plaintiff] refused to change his findings although he was in disagreement with his entire chain of command." Deputy Chief Mitchell specifically referenced six cases that plaintiff had investigated and that were "inaccurately and incompletely reported and summarized; incorrectly analyzed; and [contained] findings *** that were supported only by [plaintiff's] lack of objectivity." In those six cases, plaintiff refused to "change his findings as directed."

¶ 20    Deputy Chief Mitchell also found that plaintiff's quantity of work was "marginal," noting that plaintiff had "failed to complete numerous investigations with findings approved by IPRA's management team," and that plaintiff and his team had failed to reduce their caseload. Deputy Chief Mitchell specifically referenced five additional cases in which plaintiff had "refuse[d] to change the summary reports to reflect the correct findings as stated by his superiors." Another case

had to be reassigned to a different investigative team to re-examine the facts, analyze the evidence, and re-write the summary report due to plaintiff's refusal to do so.

¶ 21    Plaintiff prepared a written rebuttal to the June 25, 2015, performance evaluation, and planned to discuss it with Chief Ando. On July 9, 2015, one of plaintiff's supervisors, William Weeden, told plaintiff to report to Chief Ando's office. After entering the office, Chief Ando told plaintiff that he had read the rebuttal. Plaintiff stated that he intended to add more information to the rebuttal. Chief Ando said, "You're done," and handed him a letter saying that he was terminated effective immediately. The meeting with Chief Ando lasted about one or two minutes. Mr. Weeden and Deputy Chief Mitchell "escorted" plaintiff to his office to pick up his belongings and then they escorted him out of the building. Plaintiff was told he could return the next morning to retrieve any other belongings.

¶ 22    Prior to being fired, plaintiff had intended to continue working at the IPRA for at least five more years. After his termination, the City replaced the IPRA with the Civilian Office of Police Accountability ("COPA"). Plaintiff interviewed for a position with COPA but was not hired.

¶ 23    After concluding plaintiff's direct examination, plaintiff's counsel asked to reopen it the next day to discuss his "emotional damages." Over the City's objection, the circuit court allowed plaintiff to reopen his direct examination. Plaintiff then testified as follows:

> "Q. Can you just tell us, Mr. Davis, after when you were fired on July 9th, 2015, how did that feel? What impact did that have on you as a professional and as a person?
>
> A. It was—It is depressing. When I was—The day I was fired was humiliating. It was surprising.
>
> Q. Anything else?
>
> A. I really, you know, have a problem talking about it. Give me a minute.

Q. Sure.

(Brief pause.)

A. You know, after so many years in law enforcement and you feel like you know you're doing the right thing and you know that the citizens of Chicago, especially some communities, need you, need me—

THE CITY: Objection to what the communities need, your Honor.

THE COURT: Overruled.

A. And you no longer have a position where you can help. My entire life I've been helping the citizens of Chicago in whatever way I could, and there I was making the police department better and I was being fired by someone who was making the police department worse.

Q. And that was upsetting?

A. Yes.

Q. And is that still how you feel even now three years later?

A. Yes."

¶ 24 On cross-examination, plaintiff testified that despite the humiliation of being fired, he gave an interview to WBEZ news on July 20, 2015, and another interview to Univision on July 23, 2015. He stated that it was possible that he had spoken to the press about the events surrounding his termination more than 10 times.

¶ 25 Plaintiff admitted that he never sought any medical help for his emotional distress or depression resulting from his termination. He described his depression as "not severe enough to seek help."

¶ 26 On redirect examination, plaintiff testified that he felt humiliated by his termination because it was the "[f]irst time ever being fired from a job when you put so much into it." Plaintiff also stated that he spoke with the press only after they called him regarding his termination.

¶ 27                    2. Steven Mitchell's Testimony

¶ 28 Steven Mitchell was a former agent with the Drug Enforcement Administration ("DEA") before joining the IPRA as first deputy chief administrator. Deputy Chief Mitchell was the number two person at the IPRA from October 2014 to January 2016.

¶ 29 Deputy Chief Mitchell testified about the Chatman investigation, explaining that Mr. Chatman was allegedly involved in a carjacking and was behind the wheel at the time that Officer Fry and Officer Toth approached him. Officer Toth gave Mr. Chatman some instructions, but instead of complying, he reached under his seat, retrieved a black object, and fled the scene. Mr. Chatman ran between some parked cars and appeared to "turn[] his body with that black object in the direction of [Officer] Toth." Officer Fry then shot and killed Mr. Chatman.

¶ 30 Plaintiff and Investigator Grace Wilson investigated the shooting and held two meetings with Deputy Chief Mitchell. During the first meeting, plaintiff stated that he felt that the shooting was unjustified and that the charges against Officer Fry should be sustained. Investigator Wilson concurred.

¶ 31 The second meeting was held after Deputy Chief Mitchell had reviewed the case file and looked at the video of the incident. Deputy Chief Mitchell told plaintiff and Investigator Wilson that he thought Officer Fry was in reasonable fear for his life at the time of the shooting and he directed that plaintiff rewrite the summary to reflect that the shooting was "justified." Plaintiff responded that he did not feel comfortable being asked to "lie" about the circumstances surrounding the shooting. Deputy Chief Mitchell told plaintiff that he was not being asked to "lie,"

but that he was being asked to find that the shooting was justified based on Mitchell's review of the facts and evidence. Plaintiff then prepared a new summary that contained the same factual findings as the original summary, but in the conclusion, plaintiff wrote that the shooting was justified, and he placed Deputy Chief Mitchell's name on the report. Deputy Chief Mitchell testified that his impression was that plaintiff "was being insubordinate. He was given a directive, and he did not comply."

¶ 32    Deputy Chief Mitchell reported plaintiff's conduct to Chief Ando and provided him with a copy of the summary prepared by plaintiff. Deputy Chief Mitchell subsequently prepared plaintiff's final performance evaluation, giving him an overall rating of "marginal" based on the number of cases he had failed to close as well as his repeated refusal to "agree with the management" in their analysis of whether certain cases of officer-involved shootings should be classified as justified or unjustified.

¶ 33    Deputy Chief Mitchell subsequently attended the July 9, 2015, meeting in which plaintiff gave his rebuttal to the performance evaluation. At the end of the meeting, which took about 5 to 10 minutes, Chief Ando stated that he was "done talking" to plaintiff and proceeded to fire him. Deputy Chief Mitchell and Carlos Weeden escorted plaintiff out of the building. Plaintiff "wasn't happy" and asked that he not be escorted out of the building, but Deputy Chief Mitchell told plaintiff that he "was directed by [Chief] Ando to escort him out of the building, and that's what [he] was going to do."

¶ 34                              3. Scott Ando's Testimony

¶ 35    Scott Ando worked at the DEA for 28 years before being hired as the first deputy chief administrator of the IPRA in 2011. In January 2014, the Mayor appointed him chief administrator.

His job responsibilities included reviewing all sustained findings of police misconduct and all findings on officer-involved shootings.

¶ 36   Chief Ando found that in some of plaintiff's cases, "the findings that he submitted [sustaining the allegations of excessive force] were incorrect and needed to be corrected." Chief Ando sometimes wrote "internal nonconcurrence memos" in those cases, stating his disagreement with plaintiff's findings, but plaintiff refused to ever make any changes.

¶ 37   Regarding the investigation surrounding Officer Fry's shooting of Mr. Chatman, Chief Ando testified that plaintiff found that the shooting was unjustified. Chief Ando reviewed the videotape of the shooting and came to the opposite conclusion, finding that the shooting was justified because Officer Fry reasonably could have believed that Mr. Chatman was aiming a gun toward Officer Toth. Deputy Chief Mitchell agreed that the shooting was justified.

¶ 38   Deputy Chief Mitchell told Chief Ando that plaintiff refused to "change and correct" his findings that the shooting of Mr. Chatman was unjustified. Deputy Chief Mitchell subsequently prepared an evaluation of plaintiff, finding that he had performed his work "marginally." Chief Ando agreed with the evaluation.

¶ 39   Plaintiff subsequently submitted a written rebuttal to the evaluation prepared by Deputy Chief Mitchell. He argued against every component of the evaluation, disagreed with the conclusion that his work product was "marginal," and accused Chief Ando and Deputy Chief Mitchell of having a vendetta against him. Chief Ando found the rebuttal to be "insulting" and "arrogant."

¶ 40   Chief Ando testified to meeting with plaintiff on July 9, 2015, to discuss his rebuttal. Deputy Chief Mitchell and Mr. Weeden were also present at the meeting, which lasted about 15 minutes. During the meeting, plaintiff again stated his unwillingness to make any changes to the

findings in the Chatman shooting or to his findings in other investigations in which he disagreed with Chief Ando and Deputy Chief Mitchell. Chief Ando grew "tired of the insubordination" and terminated plaintiff.

¶ 41 Chief Ando directed Deputy Chief Mitchell to escort plaintiff out of the building. Chief Ando explained that the escort was "normal City policy" so as to ensure that plaintiff did not take anything with him that he was not supposed to take, such as his identification card, office keys, and "things of that nature."

¶ 42 After plaintiff was terminated, there were press inquiries. In response to those inquiries, Chief Ando sent an e-mail to the Mayor's press office stating that plaintiff's termination had been "in the works" for over a year due to the "difficulty that ***[Deputy Chief] Mitchell had had with [plaintiff] in terms of findings and investigations."

¶ 43                    4. William Weeden's Testimony

¶ 44 Mr. Weeden testified that he worked at the IPRA from 2008-2016, managing investigative teams and their superiors, including plaintiff. Mr. Weeden's evaluations of plaintiff were "always positive" because his work product was "very good, excellent."

¶ 45 Mr. Weeden attended several meetings with plaintiff, Deputy Chief Mitchell, and Chief Ando regarding the shooting of Mr. Chatman. Plaintiff had determined that Mr. Chatman's shooting was unjustified. At one of the meetings, Chief Ando and Deputy Chief Mitchell told plaintiff to draft and sign a new report finding that the shooting was justified. Plaintiff refused.

¶ 46 On July 9, 2015, Chief Ando and Deputy Chief Mitchell told Mr. Weeden to bring plaintiff to Chief Ando's office. Mr. Weeden did so. Chief Ando then asked plaintiff to change his finding on the Chatman shooting, to indicate that the shooting was justified. Plaintiff told Chief Ando that

if he wanted the finding changed, he should do it himself. Chief Ando terminated plaintiff. Plaintiff was then "escorted back to his desk," where he collected his belongings, and left the office.

¶ 47                                     5. Grace Wilson's Testimony

¶ 48     Ms. Wilson was an IPRA investigator who plaintiff supervised in 2014 and 2015. In her 30 years investigating allegations of police misconduct, plaintiff was one of the best supervisors she ever had. She never saw him act in an insubordinate or unprofessional manner toward anyone.

¶ 49     Ms. Wilson and plaintiff investigated Officer Fry's shooting of Mr. Chatman and found that it was unjustified because Mr. Chatman was fleeing from the officers and was not armed with a weapon. Deputy Chief Mitchell held a meeting with plaintiff and Ms. Wilson and told them to change their finding and to report that the shooting was justified. They refused. Chief Ando sent them an e-mail ordering them to change the finding in the Chatman shooting. Again, plaintiff and Ms. Wilson refused to change their finding. The Chatman investigation was then reassigned to a new investigator and supervisor, who found that the shooting was justified.

¶ 50                                     6. Tiffany Williams' Testimony

¶ 51     Ms. Williams was a former IPRA investigator supervised by plaintiff. Plaintiff was a "thoughtful" and "concerned" supervisor whose experience from his time as a police officer provided helpful insights into their investigations.

¶ 52     While at the IPRA, Chief Ando pressured her to change certain investigative findings sustaining allegations of excessive force. Ms. Williams feared she would lose her job if she did not change her findings. One such case involved a juvenile, C.W., who alleged that Officer Salcedo struck him in the head/face with either his fist or some type of object. Ms. Williams and plaintiff took C.W.'s statement and examined the medical evidence showing a "horrific injury" to him and wrote a report sustaining the allegation of excessive force used against C.W. The C.W. case was

later transferred to a different investigator and supervisor, who changed the report and found that the allegation of excessive force used by Officer Salcedo against C.W. was unfounded.

¶ 53    Ms. Williams was present on the day plaintiff was fired and saw him being escorted out of the offices by Deputy Chief Mitchell.

¶ 54                              7. Dennis Kamalick's Testimony

¶ 55    Mr. Kamalick worked at the IPRA as an investigator on plaintiff's team for five years. Mr. Kamalick described plaintiff as "positive, professional."

¶ 56    Mr. Kamalick testified about an investigation he and plaintiff worked on regarding a shooting by Officer Sajit Walter. At about 9:15 p.m. on January 4, 2011, Officer Walter shot at four individuals who were inside a vehicle, striking two of them. Based on the positioning of the bullet holes and bullet fragments in the rear of the vehicle, Mr. Kamalick and plaintiff concluded that Officer Walter "discharged the weapon at a fleeing vehicle." No statements were taken from the persons inside the vehicle, as they were underage and their parents did not permit them to participate in the investigation. Mr. Kamalick and plaintiff found that the shooting was unjustified.

¶ 57    Chief Ando subsequently called Mr. Kamalick and Deputy Chief Mitchell into his office to discuss the investigation of Officer Walter; plaintiff was not asked to attend the meeting. Chief Ando asked Mr. Kamalick to change his finding to exonerate Officer Walter. Mr. Kamalick refused. Chief Ando then stated that Deputy Chief Mitchell "[will] change it for you."

¶ 58    About one month later, plaintiff was fired. The shooting investigation involving Officer Walter was eventually reassigned to another investigator, who rewrote the summary to find that the shooting was justified.

¶ 59                              8. Maria Olvera's Testimony

¶ 60    Ms. Olvera was a supervising investigator at the IPRA. After plaintiff's termination, Chief Ando assigned her to review the investigation into Officer Walter's shooting into the fleeing vehicle. Ms. Olvera subsequently submitted a report reversing plaintiff's finding that the shooting was unjustified. Ms. Olvera found that the shooting was justified, and exonerated Officer Walter of the claim of excessive force.

¶ 61    Chief Ando also assigned her to review the investigation into the allegation that Officer Salcedo used excessive force against a juvenile, C.W. Ms. Olvera subsequently submitted a report reversing plaintiff's finding of excessive force. Ms. Olvera found that Officer Saledo used no force against C.W. despite the booking photo showing damage to C.W.'s eye and nose.

¶ 62    The trial court subsequently admitted C.W.'s booking photo into evidence.

¶ 63            II. Closing Argument, Instructions, Verdict, and Post-Judgment Motion

¶ 64    During closing argument, plaintiff told the jury:

    "You had the opportunity to observe [plaintiff] on the stand talking about how this firing, how the way that he was treated makes him feel. You could tell how this affected him. He said it was humiliating. So you will be given the responsibility of deciding what this is worth and coming up with a number to compensate [plaintiff] for his emotional damages.

    Now, when you take [plaintiff's] special damages, his lost wages and benefits then you add to that emotional damages, whatever you decide, you get the total damages award in this case.

    I'm going to make a suggestion as to what your total damages award should be, and this truly is just a suggestion. If you think you should go higher, you can go higher. It is

100% up to you. But what I'm going to suggest is that for total damages you award [plaintiff] between $2 million and $4 million. It's entirely up to you."

¶ 65   The trial court instructed the jury:

"If you decide for Plaintiff on the question of liability, you must then fix the amount of money which will reasonably and fairly compensate him for any of the following elements of damages proved by the evidence to have resulted from the wrongful conduct of the Defendant:

1. The emotional distress experienced and reasonably certain to be experienced in the future.

2. The value of time, earnings, salaries, and benefits lost and the present cash value of the time, earnings, salaries, and benefits reasonably certain to be lost in the future."

Illinois Pattern Jury Instructions, Civil, Nos. 30.01, 30.05.01 (2011).

¶ 66   The jury returned a verdict in favor of plaintiff on his Whistleblower Act claims and on his common-law retaliatory discharge claim and awarded him $800,000 for lost salary and benefits and $2 million in damages for emotional distress.

¶ 67   The City filed a post-judgment motion for judgment n.o.v. or a new trial on damages or, in the alternative, remittitur. The trial court denied the motions for judgment n.o.v. or a new trial on damages. The court granted the motion for remittitur in part, reducing the salary and benefits award by $48,530, which plaintiff accepted. The court denied remittitur of the $2 million in damages for emotional distress, stating that the $2 million verdict would stand in light of "the entirety of the record, and specifically *** of the plaintiff's testimony regarding [his termination] including the *** public, the public presence of it."

¶ 68   The court entered judgment in the total amount of $2,751,469.96. The City appeals.

¶ 69                                    II. Analysis

¶ 70    On appeal, the City's only argument is that the trial court erred by denying its motion for a remittitur of the $2 million damages award for plaintiff's emotional distress. The City makes no argument that the court committed any evidentiary or instructional errors.

¶ 71    We review the trial court's ruling on a motion for a remittitur under the abuse of discretion standard. *Estate of Oglesby v. Berg*, 408 Ill. App. 3d 655, 661 (2011). An abuse of discretion occurs if the trial court's ruling was arbitrary, ignored principles of law or if no reasonable person would take the position adopted by the trial court. *Id.*

¶ 72    A remittitur is an agreement by plaintiff to remit to defendant that portion of the jury's verdict that constitutes excessive damages and to accept the sum that has been judicially determined to be properly recoverable. *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 253 (2006). The trial court does not have the authority to reduce the damages by entry of a remittitur if plaintiff objects. *Id.* The trial court must afford plaintiff the opportunity of agreeing or refusing to agree to the entry of a remittitur, with the proviso that plaintiff's refusal to agree to the entry of a remittitur will result in a new trial. *Id.* at 253-54.

¶ 73     The purpose of a remittitur is to correct an excessive jury verdict under limited and appropriate circumstances. *Oglesby*, 408 Ill. App 3d at 661. As the determination of the amount of damages is a function reserved for the jury, the reviewing court will not lightly substitute its opinion for the judgment rendered in the trial court. *Kindernay v. Hillsboro Area Hospital*, 366 Ill. App. 3d 559, 572 (2006). "A verdict will not be set aside by a court unless it is so excessive that it indicates that the jury was moved by passion or prejudice or unless it exceeds the necessarily flexible limits of fair and reasonable compensation or is so large that it shocks the judicial conscience." *Id.*

¶ 74    The City first argues that the trial court should have entered the remittitur because the

$2 million that the jury awarded plaintiff for the emotional distress resulting from his retaliatory

termination and from the City's violations of the Whistleblower Act exceeds the necessarily

flexible limits of fair and reasonable compensation. In support, the City notes that plaintiff

provided "scant testimony" of the emotional distress caused by his retaliatory termination and by

the Whistleblower Act violations, he described no physical manifestations of emotional distress

and no long-term mental effects, and he even admitted that he had not sought counseling because

his depression was "not severe enough to seek help." The City also points out that plaintiff offered

no expert testimony to corroborate the effects of his termination on his mental state.

¶ 75    Plaintiff counters that the City's arguments are unavailing, because: (1) there is no exact

standard for fixing damages for emotional distress (see *Hendrickson v. Cooper*, 589 F.3d 887, 893

(7th Cir. 2009)); (2) the fact that a plaintiff testifies only briefly about his emotional distress does

not necessarily lessen the severity of the injury (see *Reinneck v. Taco Bell Corp*., 297 Ill. App. 3d

211, 219 (1998)); (3) expert testimony is not required to support a claim of emotional distress

(*Thornton v. Garcini*, 237 Ill. 2d 100, 109 (2010)); and (4) a plaintiff's testimony about his

emotional distress can itself suffice to support an award for nonpecuniary loss. See *Merriweather

v. Family Dollar Stores of Indiana, Inc.*, 103 F.3d 576, 580 (7th Cir. 1996).

¶ 76    We fully agree with plaintiff that his testimony was sufficient to support his claim for

emotional distress damages (and the City concedes as such, stating that it "does not assert that

[plaintiff] is entitled to no emotional damages") due to the City's mistreatment and wrongful

conduct. The issue before us, however, is whether plaintiff's testimony supports an award in the

amount of $2 million. We look to the entirety of plaintiff's testimony regarding his emotional

distress to determine whether the $2 million awarded to him falls within the "necessarily flexible limits of fair and reasonable compensation." *Kindernay*, 366 Ill. App. 3d at 572.

¶ 77    Plaintiff testified that during his tenure at the IPRA in 2014-2015, he had repeated conflicts with Chief Deputy Mitchell and Chief Ando regarding his findings in various cases sustaining the allegations of excessive force. Plaintiff testified with particularity as to the Chatman case. However, plaintiff testified that his emotional distress for which he seeks damages did not begin until the day of his termination, July 9, 2015. Plaintiff testified to being surprised, depressed, and humiliated by his termination, as he felt like he had been working on behalf of the citizens of Chicago in contrast to Chief Ando, who had been working against him. Plaintiff expressed his sadness at no longer being able to work for the public good, and stated that he was still upset as of the date of trial. Plaintiff took a brief pause to regain his composure while testifying.

¶ 78    Plaintiff gave no other testimony on direct examination regarding his emotional distress or the severity thereof. Plaintiff did not indicate during direct examination that he was in any way incapacitated by his emotional distress or that the emotional distress from his termination impacted his daily living. Plaintiff testified to no physical symptoms.

¶ 79    During cross-examination, plaintiff actually downplayed the severity of his emotional distress, stating that he had not sought any medical help for the depression resulting from his termination and admitting that the depression was "not severe enough to seek help."

¶ 80    During redirect examination, plaintiff testified that the humiliation he felt was from "being fired from a job when [he] put so much into it."

¶ 81    That was the extent of the testimony as to plaintiff's emotional distress. As discussed, plaintiff offered no medical or expert testimony as to his emotional distress, nor did any friends, family, neighbors, or co-workers provide any type of testimony regarding ongoing emotional or

physical effects. See *Schandelmeier-Bartels v. Chicago Park District*, 634 F.3d 372, 390 (7th Cir. 2011) (higher damages awards for emotional distress require "first-and-third person testimony regarding ongoing emotional and physical effects").

¶ 82    On this scant record, we can find no evidentiary support for the jury's award of $2 million for emotional distress. In denying the City's motion for a remittitur, the trial court alluded to "the entirety of the record" as supporting the $2 million verdict, but as just discussed, the record does not support such an enormous award. The trial court briefly mentioned the "public" nature of plaintiff's termination as supporting the $2 million verdict, and plaintiff briefly asserts on appeal that the jury could have considered that the public nature of his termination damaged his reputation. However, plaintiff never himself testified that he was distressed that his termination was made public, nor did he make any claim in his complaint for loss of reputation and he did not testify to any purported harm to his reputation. To the contrary, plaintiff testified that he agreed to give more than 10 interviews to the press about his termination, thereby indicating his willingness to bring publicity to it.

¶ 83    Plaintiff argues on appeal that the jury could have found "particularly embarrassing" the fact that he was escorted out of the building on the day of his termination. However, plaintiff never specifically testified that his emotional distress stemmed in any way from his escort from the building, and in any event, he fails to explain how any such discomfort he felt merited a $2 million award.

¶ 84    The $2 million award not only exceeds the necessarily flexible limits of fair and reasonable compensation, but it is also so large as to shock the judicial conscience. The City maintained that its research uncovered only one employment case in which a reviewing court has upheld an award of as much as $2 million in damages for emotional distress, and that case involved the sexual

assault of an employee by her supervisor. See *Griffin v. City of Opa-Locka*, 261 F.3d 1295 (11th Cir. 2001). The City asserts that no other court has allowed an award of $2 million or larger for emotional distress damages to stand in an employment case. See *e.g.*, *Emamian v. Rockefeller University*, 2018 WL 2849700 (S.D.N.Y. June 8, 2018) (remitting $2 million award for emotional damages to $200,000); *Paul v. Asbury Automotive Group, LLC*, 2009 WL 188592 (D.Or. Jan. 23, 2009) (remitting emotional distress damages of $1.9 million and $2.1 million to $150,000 for each plaintiff); *Brady v. Wal-Mart Stores, Inc.*, 455 F.Supp.2d 157 (E.D.N.Y. 2006) (remitting emotional distress damages of $2.5 million to $600,000); *Spina v. Forest Preserve District of Cook County*, 207 F.Supp.2d 764 (N.D.Ill. 2002) (remitting $3 million award for emotional distress damages to $200,000); *Distefano v. Long Island R.R. Co.*, 1999 WL 1704784 (E.D.N.Y. Dec. 21, 1999) (remitting $7 million award for emotional damages to $125,000).

¶ 85    Plaintiff argues that we should disregard the employment cases remitting verdicts of $2 million or more because courts in Illinois have generally declined to compare damages awarded in one case to damages awarded in another case in determining whether a particular award is excessive. *Richardson v. Chapman*, 175 Ill. 2d 98, 114 (1997). However, nothing in *Richardson* prevents us from finding that to affirm the jury's $2 million award for emotional distress damages on the scant facts of this case, which did not involve a sexual assault and which resulted in no physical manifestations or long-term mental effects and was not severe enough for plaintiff to seek any medical treatment, would be completely unprecedented in Illinois. The $2 million award requires remittitur because it is so excessive given the lack of evidence regarding the severity of plaintiff's emotional distress as to shock the judicial conscience.

¶ 86    During oral argument on this case, plaintiff argued that contrary to the City's research, he had found several employment cases from around the country upholding similarly large emotional

distress verdicts, such that the $2 million verdict here is not an outlier and should not shock the judicial conscience. Plaintiff did not cite those cases in his appellee's brief, but he has since filed a motion for leave to cite the additional authority he alluded to during the oral argument. We have granted the motion, and now address the additional authority.

¶ 87 Plaintiff cites *Osorio v. Source Enterprises, Inc.*, 2007 WL 683985 (S.D.N.Y. Mar. 2, 2007), and *Bailets v. Pennsylvania Turnpike Comm'n*, 181 A.3d 324 (Pa. 2018). Each of those cases are distinguishable from the present one.

¶ 88 In *Osorio*, plaintiff was terminated from her position as Editor-in-Chief of The Source, a publication with 2 million readers focusing on "hip hop" music and culture. *Osorio*, 2007 WL 683985, at *5. Plaintiff filed suit alleging that her former employers had discriminated against her on the basis of gender by creating a hostile work environment and by terminating her for discriminatory reasons. *Id.* at *1. Plaintiff also alleged that defendants retaliated against her for complaining about the alleged discrimination and that she had been defamed. *Id.* A jury awarded plaintiff over $4 million in damages on her claim of unlawful retaliation. *Id.* Defendants filed a posttrial motion seeking a remittitur. *Id.* The court denied the remittitur motion, noting that although the $4 million in damages was "a very full verdict," it was supported by the evidence. *Id.* at *5. The court specifically noted that "plaintiff testified at some length about the emotional distress and damage to reputation caused by the retaliation, including how defendants' retaliation caused her to feel depressed and anxious and to feel embarrassed in front of others in the industry, as well as causing her difficulty during subsequent job interviews and professional events and the like." *Id.*

¶ 89 In *Bailets*, plaintiff, a former employee of the Pennsylvania Turnpike Commission (Commission) brought an action against the Commission for violation of the Whistleblower Law,

alleging that he was terminated in retaliation for his reports of wrongdoing and waste committed by a contractor that was politically connected to the Commission. *Bailets*, 181 A.3d at 326-27. Plaintiff testified that the "emotional impact" of losing his employment was "devastating," "humiliating," "painful," "very demeaning," and "very difficult emotionally," and caused him "no end of sleepless nights." *Id.* at 328. Plaintiff testified to the humiliation he felt in being escorted out of the office on the day of his firing, and to the mental distress he suffers when contemplating paying his bills and paying the educational expenses of his children. *Id.* He testified to the anguish of informing his father-in-law and daughter about the job termination. *Id.* Plaintiff's wife testified that plaintiff cries on occasion because he wonders whether he will get another good-paying job, and that he has expressed his guilt for "putting our family through this." *Id.*

¶ 90    The trial court credited the testimony of plaintiff and his wife regarding the "deep humiliation, anguish and harm to reputation" he suffered as a result of his termination, and awarded him non-economic damages of $1.6 million for the harm to his reputation, humiliation, and mental anguish. *Id.* at 329. The Commission filed a motion for a remittitur, which the court denied. *Id.* The Supreme Court of Pennsylvania affirmed, stating:

> "[W]e cannot say the verdict was excessive, or that it shocks the conscience, or that it was clearly based on partiality, prejudice or passion. First, [the Commission] clearly minimizes the level, duration and extent of [plaintiff's] non-economic injuries. To the tabulation of harms [the Commission] acknowledges were supported by evidence presented at trial, we add the existence of physical manifestations such as insomnia and weeping. [Citation.] Moreover, [the Commission's] assertion [plaintiff's] emotional state mirrored those of any person who might find himself unemployed quite misses the point that [plaintiff] became unemployed as a result of [the Commission's] intentional retaliation against him for

exposing wrongdoing, a turn-of-events about which [plaintiff] ruminated endlessly, wondering whether he had done the right thing given his resulting dire financial predicament and its impact on his family. This type of emotional upset is not commonplace." *Id.* at 336.

¶ 91    In contrast to *Osorio* and *Bailets*, plaintiff here did not testify to any severe emotional and physical effects resulting from his wrongful termination by the City, but instead admitted at trial that the emotional consequences of his termination were not so severe as to require medical help. Plaintiff also made no claim in his complaint for loss of reputation and did not testify to any purported harm to his reputation. It is the lack of *any* testimony or other evidence of the severity of plaintiff's emotional distress that compels us to find that the $2 million awarded him shocks the judicial conscience.

¶ 92    Plaintiff also cites various state trial court verdicts, both within and outside Illinois, that were not appealed and for which no reported decisions are available. In the absence of all the evidence regarding the facts of those cases, they provide no basis to support plaintiff's argument that the $2 million verdict here was not an outlier.

¶ 93    We reiterate that we have examined the cases cited to us by the parties for the sole purpose of determining whether the $2 million award for emotional distress on the facts of this case has *any* precedent. We have found no precedent supporting the $2 million award here, which is so large as to shock the judicial conscience.

¶ 94    The City asks us to remit the $2 million award to $60,000, and it cites in support *Sheils v. Gatehouse Media, Inc.*, 2015 WL 6501203 (N.D.Ill. Oct. 27, 2015). In *Sheils*, the plaintiff worked for local suburban newspapers published by GateHouse Media Suburban Newspapers, Inc. *Id.* at *1. Upon returning from her first leave under the Family Medical Leave Act (FMLA), she

was demoted. *Id.* While out on her second FMLA leave, she was fired. *Id.* Plaintiff filed two claims under the FMLA based on her demotion: an FMLA interference claim and an FMLA retaliation claim. *Id.* She also pursued claims for retaliation under the FMLA and Illinois common law based on her discharge. *Id.* The jury awarded her $60,000 for emotional distress for retaliatory discharge. *Id.* Defendant sought a remittitur, which the court denied, finding that the $60,000 award for emotional distress was "in line with emotional distress damages awarded in other actions for retaliatory discharge under Illinois law." *Id.* at *7. The court cited (*id.* at *7 n.2) to *Holland v. Schwan's Home Service, Inc.*, 2013 IL App (5th) 110560, ¶¶ 218-21, which found an emotional distress award of $400,000 not excessive where plaintiff testified about his embarrassment and sense of failure, his house foreclosure for failing to make payments, his anxiety for losing his medical insurance for his son, and where his wife testified to his difficulty socializing and managing his anger. The court also cited *Tullis v. Townley Engineering & Manufacturing Co., Inc.*, 243 F.3d 1058, 1067-69 (7th Cir. 2001), which found that an emotional distress award of $80,000 was not excessive where plaintiff testified that he felt, low, degraded, and back-stabbed and experienced financial difficulties providing for his family while without work for several months.

¶ 95    Based on our review of the evidence in this case, in which plaintiff, a 23-year officer in the CPD, testified to the continuing humiliation and depression he feels for his retaliatory termination for refusing to participate in attempts to cover up police misconduct, we believe that a remittitur to $100,000 would keep the award for emotional distress damages within the flexible limits of fair and reasonable compensation and prevent it from being so excessive as to shock the judicial conscience. Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994) gives us the authority to grant any relief that the case may require, including the entry of a remittitur. Accordingly, we

reduce the award of $2 million for emotional distress to $100,000 pursuant to our authority under Rule 366(a)(5). In the absence of plaintiff's consent to the entry of the remittitur within 21 days of the filing of this order or any further period in which the mandate is stayed, this matter will be remanded to the circuit court for a new trial on the question of damages for emotional distress only. See *Richardson v. Chapman*, 175 Ill. 2d 98 (1997).

¶ 96    As a result of our disposition of this case, we need not address the arguments that the $2 million award was the result of passion or prejudice and violated the Tort Immunity Act.

¶ 97    The City has not raised any arguments on appeal against the jury's finding of liability for plaintiff's whistleblower and retaliatory discharge claims, and the award for lost earnings, salary, and benefits as reduced by the trial court. Accordingly, we affirm the jury's liability finding and the reduced award for lost earnings, salary, and benefits.

¶ 98    Judgment affirmed as reduced; cause remanded if plaintiff does not consent to the remittitur.