2024 IL App (1st) 221888-U
Order filed: March 14, 2024

FIRST DISTRICT
FOURTH DIVISION

No. 1-22-1888

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| LORENZO DAVIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee/Cross-Appellant, | ) | Cook County |
| | ) | |
| v. | ) | No. 16 L 5088 |
| | ) | |
| CITY OF CHICAGO, | ) | Honorable |
| | ) | James E. Snyder, |
| Defendant-Appellant/Cross-Appellee. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE ROCHFORD delivered the judgment of the court.
Justices Hoffman and Ocasio concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The City appealed the jury's $1.1 million award to plaintiff for emotional distress damages related to its unlawful retaliation against him for whistleblowing. We affirmed, finding that the award was supported by the evidence. On plaintiff's cross-appeal from the order reducing his attorney fees by over 50%, we reversed and remanded for a new hearing on the fee petitions.

¶ 2    Plaintiff, Lorenzo Davis, was a supervising investigator for the Independent Police Review Authority (IPRA), charged with investigating allegations of excessive force by Chicago police officers. Plaintiff filed a fourth amended complaint alleging that the City of Chicago unlawfully retaliated against him, culminating in his termination, for repeatedly sustaining charges of

excessive force. In count I, plaintiff contended that the City violated sections 15(b) and 20 of the Whistleblower Act (740 ILCS 174/15, 174/20 (West 2018)). Count II alleged common-law retaliatory discharge. In the first trial in this cause, the jury found in favor of plaintiff and in pertinent part awarded him $2 million for emotional distress. On the City's appeal, we remitted the $2 million award to $100,000. See *Davis v. City of Chicago*, 2020 IL App (1st) 182551-U (*Davis I*). Plaintiff did not consent to the remittitur and therefore we remanded the cause for "a new trial on the question of damages for emotional distress only." *Id.* ¶ 95. On retrial, the second jury awarded plaintiff $1.1 million, allocated as $600,000 for the emotional distress he already has experienced and $500,000 for future emotional distress. The City appeals the second jury's $1.1 million award, arguing that it lacks evidentiary support, shocks the judicial conscience, and is the result of passion and prejudice. We affirm.

¶ 3    Plaintiff cross-appeals from the court's order awarding him only one-half of his attorney fees from November 7, 2018, to February 1, 2022, and none of his litigation costs. We reverse and remand for a new hearing on the fee petitions.

¶ 4    During the retrial, plaintiff testified he was 71 years old. He graduated from the University of Illinois-Chicago in 1972 and became a full-time teacher in various Chicago public schools. In 1981, plaintiff changed professions and joined the Chicago Police Department (CPD). He spent 23 years in the CPD in various ranks, including patrol officer, detective, sergeant, lieutenant, and commander. Plaintiff retired from the CPD in 2004.

¶ 5    In 2008, plaintiff applied for a position with the IPRA, an entity separate from the CPD that investigated officer-involved shootings and allegations of excessive force. Plaintiff began work as an entry-level investigator in October 2008 and was promoted to a supervising investigator in 2010.

¶ 6 Plaintiff explained the process used to conduct an excessive force investigation. Initially, a complainant files an affidavit alleging excessive force. A team of investigators then interviews witnesses, canvasses the relevant area and gathers any available evidence. The investigators prepare a report summarizing the evidence and giving their conclusion as to whether the involved officers engaged in excessive force. They make a penalty recommendation. When the investigators find that the allegation of excessive force is sustained, the report is forwarded to the IPRA deputy chief and then to the chief administrator of the IPRA. If the chief administrator approves of the finding and of the penalty recommendation, the report is passed on to the superintendent of police, who actually imposes the discipline on the officers. If the superintendent disagrees with the penalty recommendation, the Police Board decides on the appropriate penalty.

¶ 7 When plaintiff first joined the IPRA in 2008, Ilana Rosenzweig was the chief administrator. She rarely disagreed with the investigators' findings. In 2014, Scott Ando became chief administrator of the IPRA and he hired Steven Mitchell as his first deputy chief. Ando and Mitchell soon began disagreeing with plaintiff's sustained findings of excessive force and they ordered plaintiff and his team members to change their findings to not sustained. Plaintiff felt like he was being asked to break the law and to submit false official reports exonerating officers who actually were guilty of using excessive force. This caused plaintiff to feel anxiety.

¶ 8 During monthly meetings, plaintiff questioned Ando and Mitchell as to why they disagreed with any finding sustaining a charge of excessive force, even when the evidence clearly showed that the force used was unjustified. Ando responded that plaintiff was biased against police officers. Plaintiff felt humiliated by the accusation of anti-police bias.

¶ 9 Ando initiated a new policy requiring an investigator to "do what your immediate supervisor tells you to do," which plaintiff viewed as being directed to him and his team's refusal

to change their findings sustaining allegations of excessive force. Plaintiff felt like the new policy constituted an attack on him.

¶ 10    During plaintiff's last year at the IPRA, Ando stopped assigning him any more cases related to officer-involved shootings and began reassigning plaintiff's investigators to other teams. Plaintiff felt frustrated, powerless, upset, sad, and depressed. Plaintiff likened the re-assignment of cases to a coverup of excessive force.

¶ 11    Plaintiff testified about one case in particular that epitomized his difficulties in working for Ando and Mitchell. That case involved an officer who chased 17-year-old Cedrick Chatman and shot him in the back, killing him. Chatman had a cellphone box in his hand at the time of the shooting, but no weapon. Plaintiff worked the case with a member of his team, Grace Wilson. After conducting an investigation for more than one year, including interviewing witnesses, examining the scene, and reviewing video footage, they issued a report finding that the shooting was not justified.

¶ 12    Mitchell subsequently called plaintiff into his office for a meeting and shouted at him to change the finding so as to exonerate the officer involved in the Chatman shooting. Several co-workers heard the shouting. Plaintiff testified that being shouted at like that caused him to feel embarrassed, frustrated, humiliated, anxious, stressed, and helpless and also made his blood pressure go up. Plaintiff felt as if he had been treated like a child.

¶ 13    Plaintiff further explained that he felt his purpose in life was to investigate excessive force allegations and bring integrity to police investigations and he was concerned after the meeting with Mitchell that he would lose his job if he did not change the Chatman finding. Eventually, plaintiff submitted his report in the Chatman case but added a line stating that Mitchell directs that the

shooting be found justified. When he signed the report, plaintiff added the Latin letters V.C., which means that his signature was made under duress.

¶ 14    In June 2015, plaintiff received a performance evaluation from Mitchell stating that he had performed "marginally" with regard to his quality of work, which made him ineligible for a raise. Plaintiff previously had received only positive performance evaluations. The "marginal" evaluation left plaintiff feeling helpless, disrespected, upset and humiliated.

¶ 15    Plaintiff had a meeting the same day with Ando and Mitchell. Ando told plaintiff he agreed with Mitchell's evaluation. Plaintiff testified he felt under attack by them.

¶ 16    Plaintiff subsequently filed a written rebuttal and submitted it to Ando. On July 9, 2015, plaintiff met with Ando and Mitchell, thinking they would discuss his rebuttal. Instead, Ando handed him a termination letter, effective immediately. Mitchell and another supervisor, William Weeden, escorted plaintiff to his office to ensure that he turned over his identification card and keys and then escorted him out of the building. Plaintiff felt embarrassed, humiliated, and disrespected.

¶ 17    Plaintiff explained that after being terminated, he felt immediate anxiety because he was unsure about how to secure health insurance, which he needed because he has cancer. Plaintiff subsequently procured health insurance, resolving that particular source of anxiety. However, plaintiff testified that he continued to feel depressed, disrespected, and sad and he thinks about his termination and the events leading up to it "all the time, even to this very day." He explained that "God had directed [him] to right the ship of the Chicago Police Department" and that whenever he hears a news report of the use of excessive force by an officer, he replays his termination in his head and thinks about the steps he would take if he still was employed as an investigator.

¶ 18 Plaintiff further testified that prior to his termination, he was quite active, as he danced, took golf lessons and swim classes, and began weight training. He went to a fitness center with his brother and son and they ran track and lifted weights together. Since his termination, though, plaintiff no longer "feel[s] like doing anything" and mostly just stays home watching television. He once thought about starting a consulting practice focusing on police oversight matters, but was unable to build such a practice. He does not sleep well anymore as he wakes during the night. He has gained 15 pounds and feels like his life is going nowhere. Although he is still capable of obtaining joy and happiness from his family, he seldom sees any of his children or grandchildren anymore and he rarely sees his former colleagues from the IPRA.

¶ 19 Plaintiff has not sought any medical treatment for his feelings of depression, explaining that he grew up in the 1950s and 1960s when treatment for mental illness/emotional distress rarely was talked about. Also, plaintiff was influenced by his 23 years in the CPD, where the prevailing attitude was to avoid such treatment. Plaintiff explained that he would have sought treatment if he was suicidal or schizophrenic and that since he was neither, he did not seek medical help; however, he reiterated the severity of his emotional distress.

¶ 20 Grace Wilson testified that she was a former investigator at the IPRA and that plaintiff was her supervisor. Plaintiff always had a smile on his face and definitely enjoyed his job prior to Ando being hired as chief administrator. After Ando's hiring, plaintiff was not as happy and instead appeared to be burdened. Ando and Mitchell began pressuring her and plaintiff to change findings sustaining allegations of excessive force. Wilson was present during the meeting in which Mitchell insisted that plaintiff change the finding against the officer involved in the Chatman shooting. Mitchell spoke to plaintiff in a disrespectful and demeaning manner.

¶ 21    After plaintiff was terminated, he asked Wilson to bring him the personal items he had left in his office. When she did so, Wilson saw that plaintiff was despondent and hurt. She has probably seen plaintiff twice since then. Each time, plaintiff indicated how hurt he felt by his termination, which prevented him from doing "the good work that he wanted to do."

¶ 22    Dennis Kamalick testified he was a former investigator at the IPRA and that plaintiff was his supervisor. Plaintiff initially was a very supportive leader with a high level of enthusiasm for the job. After Ando's hiring, though, plaintiff appeared drawn and tired and lacked the enthusiasm he once brought to the work.

¶ 23    Following plaintiff's termination in July 2015, Kamalick next saw him about one month later at a birthday party held in a restaurant. Plaintiff appeared withdrawn, pre-occupied and concerned and was no longer an "enthusiastic, upbeat presence."

¶ 24    At the close of all the evidence, the jury returned a verdict awarding plaintiff $600,000 in damages for emotional distress experienced, and $500,000 in damages for future emotional distress. To a special interrogatory asking whether any portion of its verdict constituted a "punitive damage award to punish Defendant for its wrongful discharge of Plaintiff," the jury answered no.

¶ 25    The City filed a posttrial motion for judgment notwithstanding the verdict (judgment n.o.v.), a new trial, or for a remittitur. The trial court denied the posttrial motion.

¶ 26    Plaintiff filed petitions for attorney fees and costs incurred from November 7, 2018, to February 1, 2022. The court awarded plaintiff one-half of the attorney fees requested but none of his costs.

¶ 27    The City appeals the denial of its posttrial motions. Plaintiff cross-appeals the attorney fee and costs award.

¶ 28                                    I. The City's Appeal

¶ 29    First, the City argues that the trial court erred by denying its motion for judgment n.o.v. on the jury's award of $500,000 to plaintiff for future emotional distress. Judgment n.o.v. should be entered only when all the evidence, viewed in the light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could stand. *Wilcox v. Advocate Condell Medical Center*, 2024 IL App (1st) 230355, ¶ 38. A motion for judgment n.o.v. presents a question of law that we review *de novo*. *Id.*

¶ 30    The City argues that judgment n.o.v. should have been granted because plaintiff failed to present expert testimony in support of his claim of future emotional distress. The City cites *Neyzelman v. Treitman*, 273 Ill. App. 3d 511 (1995). In *Neyzelman*, the defendant contended that the trial court erred by instructing the jury regarding future pain and suffering. *Id.* at 517. We held:

> " '[w]here future pain and suffering can be objectively determined from the nature of an injury, the jury may be instructed on future pain and suffering based on lay testimony alone or even in the absence of any testimony on the subject. Where future pain and suffering is not apparent from the injury itself, or is subjective, the plaintiff must present expert testimony that pain and suffering is reasonably certain to occur in the future to justify the instruction.'" *Id.* at 518 (quoting *Maddox v. Rozek*, 265 Ill. App. 3d 1007, 1011 (1994)).

¶ 31    Here, the City contends that there was no way for the jury to objectively determine the extent of plaintiff's future emotional distress and therefore that, pursuant to *Neyzelman*, expert testimony was necessary to show that his distress was reasonably certain to continue in the future. The City argues that in the absence of such expert testimony, no verdict for future emotional distress can stand.  However, the City's argument on appeal runs counter to its position at the retrial. During the jury instruction conference, the parties engaged in a discussion with the court regarding the evidence required to prove emotional distress, and the City stated, "There is no

objection to the fact that there is no need for medical testimony to prove emotional distress damages ***. It's the law. We're not challenging it. We are not saying that it's not being proven because there's no medical testimony." The City proposed the following instruction allowing the jury to award future emotional distress damages even in the absence of any expert medical testimony:

"The question of liability has been decided and you are to fix the amount of money which will reasonably and fairly compensate Plaintiff for:

The pain and suffering experienced and reasonably certain to be experienced in the future as a result of his emotional distress.

The amount of damages proved by the evidence is for you to determine."

¶ 32 The court instructed the jury with the language proposed by the City:

"The question of liability has been decided and you are to affix the amount of money which will fairly and reasonably compensate the plaintiff for the emotional distress he suffered and is reasonably certain *** to be experienced in the future as a result of the defendant's violation of the Illinois Whistleblower Act and retaliation. The amount of damages that has been proved by a preponderance of the evidence is for you to determine. The law does not require medical evidence to prove emotional distress damages."

¶ 33 Our supreme court has held that " '[i]t is fundamental to our adversarial process that a party waives his right to complain of an error where to do so is inconsistent with the position taken by the party in an earlier court proceeding.' [Citation.] A party cannot complain of error which he induced the court to make or to which he consented." *McMath v. Katholi, M.D.*, 191 Ill. 2d 251, 255 (2000). On this record, the City has forfeited review of its argument that plaintiff was required to present expert testimony in support of his claim for damages for future emotional distress, where

the City's argument is inconsistent with its position at the retrial. We affirm the denial of the City's motion for judgment n.o.v.

¶ 34    Next, the City argues that even if the motion for judgment n.o.v. was properly denied, the trial court should have granted its motion for a new trial where the evidence did not support the jury's award of $500,000 for future emotional distress. Questions concerning the admission of evidence at trial are left to the sound discretion of the trial court and will not be reversed absent an abuse of discretion. *Roach v. Union Pacific R.R.*, 2014 IL App (1st) 132015, ¶ 19. A motion for a new trial should be granted only when the verdict is contrary to the manifest weight of the evidence or a party has been denied a fair trial. *Hana v. Illinois State Medical Inter-Insurance Exchange Mutual Insurance Co.*, 2018 IL App (1st) 162166, ¶ 15. The trial court's ruling on a motion for a new trial will not be reversed absent a clear abuse of discretion. *Id.*

¶ 35    The City contends that the evidence did not show that plaintiff's emotional distress was reasonably certain to continue in the future. We disagree. Plaintiff testified that even six years after his termination, he continues to feel sad, depressed and disrespected by his firing and the events leading up to it and he thinks about it every day. He explained that his job as an investigator for the IPRA allowed him to fulfill his purpose in life, and that since his termination, he no longer feels like doing anything. Whereas he used to socialize with his friends and work associates and see his family, he now mostly stays at home, rarely seeing friends and family. He continues to lose sleep and has gained weight. Plaintiff's co-worker, Wilson, testified to seeing plaintiff twice since his termination, and each time he indicated that he continues to feel hurt that he is prevented from fulfilling his purpose. On this record, there was sufficient evidence for the jury to conclude that plaintiff's emotional distress was reasonably certain to continue into the future. The trial court

committed no clear abuse of discretion by denying the City's motion for a new trial on the issue of plaintiff's damages for future emotional distress.

¶ 36    Next, the City argues that we should vacate the $600,000 jury award for the emotional distress plaintiff already has experienced and order a new trial because the award was the result of improper evidence at the retrial that should have been excluded. Specifically, the City contends that at retrial the trial court improperly admitted evidence of emotional distress plaintiff experienced from the City's pre-termination conduct toward him, such as when Aldo and Mitchell pressured plaintiff to change his investigative findings, reassigned his team members, accused him of anti-police bias, yelled at him, and gave him a negative performance evaluation. According to the City, though, any damages awarded plaintiff on retrial can only be for conduct for which it was found liable in the first trial, and plaintiff never pleaded or proved at the first trial that the City was liable for its pre-termination conduct. Plaintiff only pleaded and proved its liability for terminating him. The City argues that as plaintiff never pleaded and proved its liability for pre-termination conduct at the first trial, the trial court abused its discretion by admitting such evidence at the retrial and denying its motion for a new trial.

¶ 37    The City's argument is unavailing. A careful review of plaintiff's complaint shows that it alleged damages resulting from the City's unlawful retaliation against him in violation of the Whistleblower Act. The acts of retaliation pleaded in the complaint included not only plaintiff's termination, but also Ando and Mitchell's pre-termination conduct, when they ordered him to change his findings sustaining excessive force allegations against various officers, threatened to discipline him if he refused, and gave him a negative performance evaluation.

¶ 38    Consistent with plaintiff's complaint, the evidence at the first trial was not limited to the City's termination of plaintiff, but included all the evidence discussed earlier in this order

-11-

regarding Ando's and Mitchell's pre-termination conduct toward him, in particular their pressuring him to change his sustained findings. The court instructed the jury at the first trial that it could find the City liable under the Whistleblower Act for "disclosure retaliation" if the City retaliated against plaintiff for sustaining charges of excessive force. The jury could find the City liable for "refusal retaliation" if the City retaliated against plaintiff for refusing to change those findings. The court also instructed the jury that if it found for plaintiff on the question of liability, it may award him damages for emotional distress suffered as a result of any of the City's "wrongful conduct." The jury returned a verdict finding the City liable for disclosure retaliation and for refusal retaliation, *i.e.*, it found the City liable for Ando's and Mitchell's pre-termination conduct toward plaintiff as well as for its ultimate termination of him in retaliation for sustaining the charges of excessive force and refusing to change those findings. The jury returned a $2 million damages award for emotional distress, which we remitted, ultimately leading to the retrial when plaintiff did not consent to the remittitur.

¶ 39 On these facts, the trial court committed no abuse of discretion during the retrial when it admitted evidence of Ando's and Mitchell's pre-termination conduct. Such evidence had been admitted at the first trial and considered by the jury when finding the City liable for plaintiff's emotional distress resulting from the disclosure retaliation and the refusal retaliation. Although the City's liability was no longer at issue during the retrial, the amount of damages for plaintiff's emotional distress stemming from the disclosure retaliation and refusal retaliation remained to be determined. Testimony regarding Ando's and Mitchell's pre-termination conduct, and the emotional distress it caused plaintiff, was relevant to the damages determination on remand and its admission did not constitute error. In the absence of any evidentiary error, there was no cause

for granting the City a new trial. Accordingly, the trial court committed no clear abuse of discretion by denying the City's posttrial motion.

¶ 40    Next, the City argues that the trial court erred by denying its motion for a remittitur of the $1.1 million verdict at the retrial. A remittitur is an agreement by plaintiff to remit to defendant that portion of the jury's verdict that constituted excessive damages and to accept the sum that has been judicially determined to be properly recoverable. *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 253 (2006). Remittitur is appropriate where the jury's verdict is the result of passion or prejudice, or exceeds the necessarily flexible limits of fair and reasonable compensation, or is so large that it shocks the judicial conscience. *Kindernay v. Hillsboro Area Hospital*, 366 Ill. App. 3d 559, 572 (2006). We review the trial court's ruling on a motion for a remittitur under the abuse of discretion standard. *Estate of Oglesby v. Berg*, 408 Ill. App. 3d 655, 661 (2011).

¶ 41    The City contends that the trial court abused its discretion by denying the motion for a remittitur because the $1.1 million damages award for plaintiff's emotional distress exceeds the limits of fair and reasonable compensation and is so large as to shock the judicial conscience. The City cites our decision in *Davis I*, 2020 IL App (1st) 182551-U, the appeal from the first trial where we remitted the $2 million damages award for emotional distress to $100,000 subject to plaintiff's consent (which he did not give, necessitating the retrial). We held "a remittitur to $100,000 would keep the award for emotional distress damages within the flexible limits of fair and reasonable compensation and prevent it from being so excessive as to shock the judicial conscience." *Id.* ¶ 95.

¶ 42    The City argues that *Davis I* compels a similar remittitur to $100,000 here. We disagree. In *Davis I*, we ordered the remittitur because at the first trial, plaintiff gave no testimony regarding his emotional distress or the severity thereof and he did not indicate that the emotional distress impacted his daily life. *Id.* ¶ 78. Plaintiff offered no testimony from friends or coworkers in support

of his damages claim and admitted that his emotional distress was not severe enough to seek medical help. *Id.* ¶¶ 79, 81.

¶ 43   By contrast, at the retrial, plaintiff testified to the severity of his emotional distress, explaining that it is ongoing and has sapped his energy to the point that he no longer feels like socializing with friends and family like he used to, but instead spends most of his days at home watching television. He cannot sleep through the night anymore, has gained 15 pounds, and feels as if his life is going nowhere because he has been deprived of his purpose, which was to "bring some integrity" to investigations of excessive force. He explained his failure to seek medical help for his depression is due to his upbringing in the 1950s and 1960s, where mental health treatment was not talked about, and his time spent working for the CPD, where the prevailing attitude was to avoid such treatment. Plaintiff refuses to seek mental health treatment unless he becomes suicidal or schizophrenic, but he reiterated the severity of his depression and its impact on his daily life. Plaintiff's former co-workers, Wilson and Kamalick, testified to the ongoing effects of plaintiff's emotional distress, explaining that whereas before he was enthusiastic, upbeat, and social, he now appears withdrawn, tired, and lacking enthusiasm for life.

¶ 44   Thus, contrary to *Davis I*, the evidence at the retrial detailed how the City's violations of the Whistleblower Act caused plaintiff to suffer severe, ongoing emotional distress affecting his daily life, interfering with his social interactions, causing physical manifestations, and preventing him from fulfilling his self-proclaimed purpose in life. On this evidence, we cannot say that the jury's $1.1 million award was outside the flexible limits of fair and reasonable compensation or was so excessive as to shock the judicial conscience. The trial court committed no abuse of discretion in denying the City's motion for a remittitur.

¶ 45    The City argues, though, that the jury's $1.1 million award was the product of passion or prejudice, resulting from plaintiff's testimony at the retrial, along with his counsel's closing argument, casting the City as a bad actor and plaintiff as a hero protecting the public from the City's misdeeds. Review of the entire record of the retrial belies the City's argument that the award was the product of passion or prejudice. As discussed above, the jury's award is supported by the testimony from plaintiff, Wilson, and Kamalick detailing plaintiff's ongoing and extensive emotional distress emanating from the City's violations of the Whistleblower Act. To the extent, if any, that there was other testimony that potentially could have moved the jury to return an award based on passion, prejudice, or a desire to punish the City, we note that during opening statement and closing argument, plaintiff's counsel expressly informed the jury that its job was not to punish the City or award punitive damages. The trial court also instructed the jury that its verdict must not be based on speculation, prejudice, or sympathy, and that it must not award damages to punish the City. Finally, the jury answered "No" to the special interrogatory asking if any part of the verdict included a punitive damage award. On this record, we are satisfied that the jury's $1.1 million award for emotional distress is supported by the evidence and is not the product of passion or prejudice or a desire merely to punish the City.

¶ 46    For all the foregoing reasons, on the City's appeal, we affirm the circuit court.

¶ 47                                II. Plaintiff's Cross-Appeal

¶ 48    Following the first trial in this case, plaintiff sought attorney fees and costs under section 30 of the Whistleblower Act for work completed until November 7, 2018. Section 30 allows for the recovery of "litigation costs, expert witness fees, and reasonable attorney's fees." 740 ILCS 174/30(3) (West 2022). In determining the reasonableness of the fees, courts assess: the skill and standing of the attorneys; the nature of the case; the novelty or difficulty of the issues and work

involved; the significance of the case; the degree of responsibility required; the usual and customary charges for comparable services; the benefit to the client; and the reasonable connection between the fees sought and the amount involved in the litigation. *Young v. Alden Gardens of Waterford, LLC*, 2015 IL App (1st) 131887, ¶ 102. We review an attorney fees award for an abuse of discretion. *Id.* ¶ 105.

¶ 49    The trial court entered an order awarding plaintiff $660,254.24 in attorney fees and costs under the Whistleblower Act for work completed until November 7, 2018 (the first attorney fee order). On the City's appeal, we affirmed the first attorney fee order. See *Davis v. City of Chicago*, 2020 IL App (1st) 192155-U (*Davis II*).

¶ 50    The trial court subsequently conducted the retrial on the question of damages for plaintiff's claim of emotional distress and, as discussed, the jury awarded plaintiff $1.1 million.  Following the retrial, plaintiff submitted fee petitions for attorney fees and costs incurred between November 7, 2018, and February 1, 2022. The total amount sought was $522,797.04, representing $518,395.50 in attorney fees and $4,401.54 in litigation costs.

¶ 51    The court conducted a hearing on plaintiff's fee petitions and then entered a written order (the second attorney fee order) finding: the skill and standing of the attorney is "substantial"; the nature of the case is "complex"; there was a degree of novelty of issues; the case regards significant public concerns; the hourly rates sought are customary for comparable attorneys; the benefit to the client has been "substantial"; and there is a reasonable connection between the fees sought and the amount involved in the litigation.

¶ 52    The court further stated in the second attorney fee order that it is "mindful of the limited nature of the proceeding on remand and believes an adjustment in the fees awarded is appropriate based on that." The court awarded plaintiff $257,548.50 in attorney fees for the services rendered

from November 7, 2018, to February 1, 2022, which was less than half of what had been sought. The court awarded no litigation costs. Plaintiff appeals the second attorney fee order.

¶ 53    Plaintiff contends that the attorney fees and litigation costs from November 7, 2018, to February 1, 2022, were reasonable and should have been granted in full. The City agrees that the litigation costs should have been granted, but argues that many of the attorney fees were for unnecessary or duplicative services, and as such that the reduction was appropriate. However, the court never stated which services, if any, were unnecessary or duplicative, nor did it find any single time entry on plaintiff's billing records to be excessive or unnecessary. The court never explained how it concluded that a $260,847 reduction in attorney fees (amounting to more than 50% of the fees requested) was warranted. The only reason given by the court for reducing the requested fees by more than half is that an adjustment was appropriate based on the limited nature of the proceeding on remand. However, this stated rationale offers no explanation for why such a drastic reduction was required, and it also is seemingly at odds with the earlier finding that the fees sought were customary and reasonably related to the type of work performed and the result obtained. The court also provided no explanation for why it failed to award plaintiff any of the litigation costs he was entitled to under the Whistleblower Act.

¶ 54    This case is similar to *Graham v. Village of Dolton*, 2023 IL App (1st) 211662-U, which we cite for its persuasive value. See Ill. S. Ct. R. 23(e)(1) (eff. Jan. 2, 2021). In *Graham*, the plaintiff filed a petition for $213,000 in attorney fees and costs under the Illinois Wage Payment and Collection Act (IWPCA) (820 ILCS 115/1 *et seq*. (West 2016)). *Graham*, 2023 IL App (1st) 211662-U, ¶ 2.  The circuit court reduced the requested amount to $100,000 without providing an explanation and only awarded him attorney fees. *Id.*

¶ 55    On appeal, we discussed well-established case law holding that when the circuit court reduces the amount requested in an attorney fee petition, the court must state the reasons justifying the reduction. *Id.* ¶ 37 (citing *Richardson v. Haddon*, 375 Ill. App. 3d 312, 315 (2007), *Casey v. Rides Unlimited Chicago, Inc.*, 2022 IL App (3d) 210404, ¶ 29, and *Advocate Health & Hospitals Corp. v. Heber*, 355 Ill. App. 3d 1076, 1079 (2005)). We also noted case law holding that when the court fails to provide the requisite explanation on an award of attorney fees and costs, the proper remedy is to remand for a new hearing on the petition and for the court to provide the reasons for its decision should it again reduce the fees and costs. *Id.* ¶ 45 (citing *Wendy and William Spatz Charitable Foundation v. 2263 North Lincoln Corp.*, 2013 IL App (1st) 122076, ¶ 42). In accordance with the cited case law, we reversed the court's attorney fee and costs award under the IWPCA and remanded for a new hearing and for the court to provide the reasons for any reduction in the amount of requested attorney fees and costs. *Id.* ¶ 51.

¶ 56    Similar to *Graham* and the cases cited therein, the trial court here significantly reduced plaintiff's attorney fees and costs incurred between November 7, 2018, and February 1, 2022, without providing a sufficient explanation in the second attorney fee order that would allow us to determine whether its decision constituted an abuse of discretion. Therefore, we reverse the second attorney fee order and remand for a new hearing on the fee petitions and for the court to provide the reasons for its decision should it again reduce the fees and costs. On remand, plaintiff may file a final fee petition for those attorney fees and costs incurred since February 1, 2022.

¶ 57    We further note that the City concedes that the court should have awarded plaintiff $4,401.54 for his litigation costs incurred between November 7, 2018, and February 1, 2022. The court's new attorney fee award shall include those costs.

¶ 58    For all the foregoing reasons, on the City's appeal we affirm the circuit court. On plaintiff's

cross-appeal, we reverse and remand for further proceedings consistent with this order.

¶ 59    Affirmed; cross-appeal reversed and remanded.